IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JUDITH E. LUCKE,

                        Plaintiff,                              CV-06-1149-ST

        v.                                        OPINION AND ORDER

MULTNOMAH COUNTY, BERNIE GIUSTO,
JENNIFER OTT, RONALD BISHOP, and TIM
MOORE,

                        Defendants.

STEWART, Magistrate Judge:

## **INTRODUCTION**

      Plaintiff, Judith E. Lucke ("Lucke"), filed this lawsuit on August 10, 2006, alleging

claims against defendants Multnomah County and then Multnomah County Sheriff Bernard

Guisto ("Sheriff Giusto") arising out of various actions taken against her while she was

employed by Multnomah County.  She subsequently amended her complaint twice adding

additional defendants and claims.  The additional defendants include Jennifer Ott ("Ott"),

Human Resources Coordinator for the Multnomah County Sheriff's Office, Timothy Moore

("Moore"), former Chief Deputy of Law Enforcement for the Multnomah County Sheriff's

Office, and Ronald Bishop ("Chief Deputy Bishop"), Chief Deputy of Corrections for the

Multnomah County Sheriff's Office.  Her Second Amended Complaint ("SAC") alleges the

following claims:

| | |
|---|---|
| First Claim: | Discrimination, retaliation, and hostile work environment in violation of Title I of the American's With Disabilities Act ("ADA"), 42 USC §§ 12111-17; |
| Second Claim: | Discrimination and retaliation in violation of the Oregon Rehabilitation Act, ORS 659A.100-.145; |
| Third Claim: | Discrimination and retaliation in violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 USC §§ 2601-2654. |
| Fourth Claim: | Discrimination and retaliation in violation of the Oregon Family Leave Act ("OFLA"), ORS 659A.150-.186; |
| Fifth Claim: | Retaliation for reporting discrimination on the basis of sex and gender in violation of Title VII, 42 USC §§ 2000e-2, 2000e-3; |
| Sixth Claim: | Discrimination and retaliation on the basis of age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 USC §§ 621-34; |
| Seventh Claim: | Discrimination and retaliation on the basis of sex, gender and age in violation of ORS 659A.030; |
| Eighth Claim: | Violation of constitutional rights under the First and Fourteenth Amendments pursuant to 42 USC § 1983 ("§ 1983"); |
| Ninth Claim: | Retaliation in violation of Oregon's whistleblower statute, ORS 659A.230; |
| Tenth Claim: | Unlawful discrimination against an injured worker pursuant to ORS 659A.040; and |
| Eleventh Claim: | Failure to reinstate pursuant to ORS 659A.046. |

The Eighth Claim is alleged against all defendants.  The remaining claims are brought

only against Multnomah County.  Lucke seeks monetary and equitable remedies including

economic and non-economic damages, attorneys fees, costs and disbursements.

Defendants have filed a motion for summary judgment against all claims (docket #63).

All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this

case in accordance with FRCP 73 and 28 USC § 636(c).  For the reasons that follow, defendants'

motion is GRANTED IN PART and DENIED IN PART.

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any

material fact and "the moving party is entitled to judgment as a matter of law."  The moving

party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317,

323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the

pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing

FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter, but

only [determine] whether there is a genuine issue for trial."  *Balint v. Carson City, Nev.*, 180 F3d

1047, 1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is

'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material

fact.  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert*

*denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material.

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987).  The

court must view the inferences drawn from the facts "in the light most favorable to the

nonmoving party."  *Id* (citation omitted).  In employment discrimination cases "very little

evidence" is required to survive summary judgment "because the ultimate question is one that

can only be resolved through a searching inquiry - one that is appropriately conducted by the fact

finder upon a full record."  *Schnidrig v. Columbia Mach.*, 80 F3d 1406, 1410 (9th Cir) (internal

quotations, citation omitted), *cert denied*, 519 US 927 (1996).

## FACTUAL BACKGROUND

### I.    1997 through December 2003

Lucke began working for Multnomah County in 1997 as a pharmacy technician in the

Multnomah County Corrections Health department.  Lucke Aff., ¶ 1.  On January 8, 2001, she

accepted a position as a corrections deputy with the Multnomah County Sheriff's Office

("MCSO").  *Id*, ¶ 2; Ott Decl., ¶ 4 (Morf Decl., Ex. 2).  Lucke worked in this capacity until her

termination on June 27, 2007, with the exception of an eight-month period of administrative

leave in 2006 during which she worked in the Human Resources Department.  Lucke received

her Basic Certificate for Certified Corrections Officer from DPSST in October 2001.  During

2001, the MCSO gave Lucke a "Unit Citation" award for her contributions towards the

development of hospice care for terminally ill inmates.

Sheriff Giusto took office in January 2003.  Giusto Decl., ¶ 3 (Morf Decl., Ex. 1).  He

appointed Captain Carol Hasler as Acting Chief Deputy of the Corrections Division in January

2006 pending recruitment and placement of a permanent appointment.  *Id*, ¶ 4; Hasler Decl., ¶ 3

(Morf Decl., Ex. 6).  Captain Hasler has also been assigned as an Inspector for the Internal Affairs

Unit ("IAU") since 2003.  Hasler Decl., ¶ 3.  Sheriff Giusto replaced Captain Hasler with Chief

Deputy Bishop on July 1, 2006.  *Id*; Bishop Decl., ¶ 3 (Morf Decl., Ex. 4).

The Corrections Division operates Multnomah County's two jails, Multnomah County

Detention Center ("MCDC") and Inverness Jail ("MCIJ"), and safeguards persons in the criminal

justice system.  Giusto Decl., ¶ 5; Bishop Decl., ¶ 4.  Corrections deputies work within the jails

and may also supervise inmates while in transit, at the hospital, or at the courthouse.  Guisto

Decl., ¶ 6; Bishop Decl., ¶ 5.  Their duties require them to come into frequent contact with

inmates, including ones who are violent, disruptive, and suicidal.  Giusto Decl., ¶ 7; Bishop Decl.,

¶ 6.

Lucke alleges that early on in her career with the MCSO (September 2002), she was

stalked by a male corrections deputy.  Lucke Aff., ¶ 10.  After reporting his unwelcome advances

several times, the deputy was placed on a six-month leave of absence, after which he returned to

the same corrections facility where Lucke worked and continued to harass her.  *Id*, ¶ 11.

## II.     First Internal Affairs Unit Investigation:  Inmate Escape

On December 31, 2003, Lucke was assigned to guard inmate Timothy Dawson

("Dawson") while he was receiving medical treatment at the Portland Adventist Hospital.

Dawson acquired a set of metal silverware from his hospital dinner tray which Lucke had failed to

inspect before hospital staff gave it to him.  After Lucke removed Dawson's ankle restraints so he

could change his pants, Dawson brandished the knife and fork, held Lucke hostage, stole several

of her personal effects, and escaped.  He was recaptured shortly after he escaped.  Morf Decl., Ex.

7

The incident was referred to the IAU for investigation of Lucke's conduct.  *Id*, pp. 2-8

(IAU # 04-003).  Captain Hasler conducted the investigation.  Although, she acknowledged that

the escape was due in part to failures by other MCSO employees, Captain Hasler concluded that

Lucke had made several errors in judgment which constituted violations of Corrections Division

policies in the MCSO Agency Manual resulting in Dawson's escape.  The Sheriff's Office

Review Team ("SORT"), consisting of Captains Rai Adgers and James Turney, reviewed and

supported Captain Hasler's findings.  *Id*, pp. 9-13.  All three captains recommended a two-day

suspension as discipline for Lucke's violation of Agency Manual Rule 1.05(1) Know and

Conform to Agency Directives, and Rule 2.06(1)(a) Conduct; Generally. *Id*, p. 9. At the time, violations of Rule 1.05(1) had a base sanction of a three-day suspension and violations of Rule 2.06(1)(a) had a base sanction of five-day suspension.

Chief Deputy Moore reviewed the IAU findings and recommendation. In a memorandum to Sheriff Giusto dated October 8, 2004, Chief Deputy Moore sustained the findings with respect to Lucke's rule violations, but decreased the recommended discipline to a written reprimand along with eight days of training, in large part, because he agreed that the escape was due in part to shortcomings in MSCO policies and procedures which included a failure to properly train deputies. *Id*, pp. 14-15. Many of these policies were revised as a result of the incident. However, Chief Deputy Moore found that Lucke's not "owning" or controlling the environment and "general lack of assertiveness" were "the major contributing factors to the escape." *Id*, p. 15.

Sheriff Giusto reviewed the IAU report and agreed with the recommendations of Chief Deputy Moore. *Id*, pp. 1, 16. On October 11, 2004, he issued a Letter of Reprimand to Lucke which stated that although there "were a number of contributing factors involved" in the inmate's escape, "your lack of assertiveness in controlling the necessary security procedures were the major contributing factors to the escape . . . ." *Id*, p. 1. Sheriff Giusto also required that Lucke attend eight hours of additional training.

### III.  Commencement of Harassment

Shortly after the Dawson escape incident, Lucke asserts that a "campaign of harassment" began with a concerted effort to "document her out" of her job as a corrections deputy. Another former corrections deputy, Laurie Kimmell, also asserts that after Dawson's escape, "it appeared to me that MCSO management began looking for excuses to discipline Deputy Lucke." Kimmell

Decl., ¶ 2.  According to Lucke, Dawson's escape was due primarily to multiple failures on the part of the MCSO, and rather than accept responsibility for their improper policies, lack of training, and poor supervision, she was made the scapegoat and singled out for discipline even though multiple MCSO correction officers and supervisors were equally guilty of policy violations for the incident.  *See* Lucke Aff., ¶¶ 14-27, 28-29.  Lucke further claims that as a result of the stress she suffered from this incident, and her resulting treatment by coworkers and supervisors, she began suffering from an anxiety disorder that affected her memory, concentration, and sleeping and gave her a progressively worsening hemifacial spasm.  *Id*, ¶¶ 22-23.  She took five days off work after the escape due to this stress.  Lucke claims that various coworkers made comments to her about how she, a lithe female, should never have been assigned to guard Dawson.  *Id*, ¶¶ 25, 30.

Sergeant Kathryn Parker, one of her supervisors, became her primary antagonist, although others participated as well.  Sergeant Parker allegedly encouraged other deputies to ask her about the incident and told Lucke that she was not to have contact with Dawson at any time in the future.  Sergeant Parker's harassment of Lucke continued throughout Lucke's tenure at the MCSO and included accusing her of insubordination, assigning her menial tasks such as cleaning the refrigerator, denying her requests for training although granting requests by others, and disparaging her character and competency to others.  *Id*, ¶¶ 37, 39-44.  In February 2005, Lucke was called into a meeting with Sergeant Parker and Lieutenant Lindstrand, the Officer in Charge at the MCDC, where Sergeant Parker subjected her to various attacks and false accusations and suggested she take a job as a mental health officer because she was a great nurturer and cleaner of fridges.  *Id*, ¶ 39.  In March 2005, Lucke claims that Sergeant Parker falsely accused her of

destroying another deputy's report by turning off his computer. *Id*, ¶ 40. Lucke later met with

Captain Linda Yankee, MCDC Facility Commander, to discuss Sergeant Parker's treatment of

her. Captain Yankee acknowledged that Sergeant Parker was "giving her the run around" and

denying her training. *Id*, ¶ 42. Despite Lucke's complaints to management, Sergeant Parker's

treatment of Lucke never improved and Lucke continued to suffer harassment from her and other

employees of the Corrections Division. *See id*, ¶¶ 43-44, 48, 53, 56.

Throughout 2005, Lucke believes that male deputies interfered with her radio

transmissions. Her belief is confirmed by the testimony of Kimmell, who asserts that she

observed this activity on several occasions and reported it to her supervisor. Kimmell Decl., ¶¶ 5-

6. Both Lucke and Kimmell testify that male deputies were treated more favorably than female

deputies with respect to the terms and conditions of their employment including in the allotment

of break time, shift assignments, and duties. *Id*, ¶ 5; Lucke Aff., ¶ 55.[1]

## IV.    Second IAU Investigation:  Failure to Engage

On June 24, 2005, Lucke allegedly failed to engage and assist a coworker, Deputy Meyer,

who was in an active struggle with an intoxicated inmate he was attempting to take through the

booking process. Captain Yankee referred the incident to the IAU on August 24, 2005, and

Captain Hasler again served as the IAU Inspector in charge of the investigation into the incident.

Morf Decl., Ex. 8, pp. 1, 14. (IAU # 05-015). According to Captain Hasler's investigation,

Lucke's actions violated Agency Manual Rules 2.02(1)(a) & (d), Appropriate Action Required.

*Id*, p. 2. Captain Hasler initially recommended a one-day suspension without pay as discipline.

The SORT, consisting of Captain Yankee and Lieutenants Lindstrand, Seiler, and Wheeler,

---

[1] Lucke also relies on Kimmell's written statement addressed to Lucke's attorney which is stricken as hearsay. Snyder Decl., Ex. J (Memorandum from Laurie Kimmell, ¶ 1).

agreed that Lucke violated Rules 2.02(1)(a) & (d).  All SORT members recommended a more significant suspension ranging from two to five days based on Lucke's inconsistent explanations and failure to take responsibility for her actions.  *Id*, pp. 3-11.  Captain Yankee and Lieutenant Wheeler believed that Lucke was not being truthful.  Based on their recommendations, Captain Hasler increased her recommended discipline to a five-day suspension in her final report dated December 13, 2005.  *Id*, p. 4.

On February 13, 2006, Chief Deputy Moore reviewed the findings and recommended that Lucke serve a four-day suspension in addition to eight hours of assertiveness training.  *Id*, p. 12.  On March 23, 2006, Sheriff Giusto met with Lucke, her union representative, Deputy Hewitt, and Chief Deputy Moore to discuss the IAU investigation.  According to Sheriff Giusto's account, Deputy Lucke acknowledged the issue as problematic and gave some "personal" life issues as potential explanations.  *Id*, p. 13.  Sheriff Giusto suspended Lucke for only two days without pay and ordered her to complete eight hours of assertiveness/engagement training.  *Id*, p. 1.  His letter to Lucke states that "[t]he sustained findings are based on the evidence in the file that your lack of engagement in a use of force incident demonstrate [*sic*] a compromise to your ability and attitude to control an offender's behavior, which is the core of a deputy's job function."  *Id.*

Lucke's account of the failure to engage incident is very different from the findings made by the IAU investigation.  First, she argues that the booking-room video supports her version of the story that the inmate was easily placed under control and that she responded appropriately.  *Id*, ¶ 52.  Second, she claims that the investigation into the incident was started only after she returned from an extensive medical leave absence which began the day after the incident and continued until July 17, 2005.  Lucke Aff., ¶¶ 47-48.  On July 18, 2005, she claims she was pulled

into a meeting in which she was asked to explain the situation and in which Sergeant Parker

denied her the opportunity to watch the video of the incident or read the report she made on the

date of the incident despite the fact that she was suffering memory problems due to her anxiety

disorder. *Id.*

The attendance records maintained by the MCSO do not support Lucke's timeline. The

records show that she took only three days FMLA leave immediately after this incident. Morf

Decl., Ex 37, p. 47. Otherwise she worked right up until the date the investigation started except

for a few personal holidays. However, Lucke took additional FMLA leave to care for her father

from August 21 to 23, 2005, and this incident was referred to the IAU the day after she returned.

## V.    Third IAU Investigation:  Encouraging Inmates to Fight

A few months after the commencement of the IAU investigation into the failure to engage

incident, a third IAU investigation began into a claim that Lucke encouraged two inmates to fight.

On October 30, 2005, Lucke was working at the MCIJ overtime in the female housing unit. One

inmate came up to Lucke and complained that the other was a snitch, evidently in response to

earlier drug busts that had occurred in the unit. Lucke responded by telling the inmate "to patch it

up, or have it out." Lucke Aff., ¶ 60; Snyder Decl., Ex. R. One of the inmates stood up and put

her hands up. Lucke's partner, Deputy Anderson, handcuffed and escorted her to the disciplinary

dormitory. Lucke Aff., ¶ 60.

On November 1, 2005, the facility commander, Captain Adgers, submitted a complaint to

the IAU to investigate Lucke's comment. Morf Decl., Ex. 9, p. 13 (IAU # 05-022). After an

investigation, the SORT and IAU Inspector Captain Bruce McCain sustained a finding that Lucke

violated Agency Manual Rule 2.06(1)(a), Conduct; Generally. *Id*, p. 3. The SORT team

consisted of Captain Adgers and Lieutentants Seiler, Getman and Peterson.  In his review,

Captain Adgers explained that he felt "that Deputy Lucke's decision to allow inmate [*sic*] to

'have it out' only escalated the tension in the dorm.  The actions of the Deputy clearly did not

follow the level of training for officer response or for contacting an immediate supervisor."  *Id*, p.

9.  He further believed that Lucke's behavior created "a level of deliberate indifference to that of

the care and custody for the inmates one is responsible for . . . ."  *Id.*  The SORT reached

consensus that the recommended corrective action should be a five-day suspension without pay,

the base sanction for a violation of Rule 2.06.  *Id*, p. 2.

Chief Deputy Moore reviewed Captain McCain's findings and recommendation on

February 21, 2006, and agreed that Lucke violated Rule 2.06(1)(a) and should receive a five-day

suspension.  *Id*, p. 12.  Sheriff Giusto accepted their sustained findings but reduced the discipline

to a three-day suspension without pay, despite the fact that the SORT had found that no

mitigating factors applied and that Lucke never accepted responsibility for her actions.  His letter

dated March 23, 2006, informing Lucke of his decision, states in part:

> The sustained findings are based on the evidence in the file and your
> statements that you encouraged an inmate to fight with another inmate as a
> resolution to conflict. This action resulted in your integrity and professional
> behavior to be brought into question.
>
> After careful review of the facts surrounding the allegations, I concur with
> the findings.  It is my expectation that a three (3) day suspension from duty
> without pay will be sufficient to impress upon you your obligations as a
> Sheriff's Office employee to comply with agency work rules.
> Any future sustained violation of this procedure or further violations that
> demonstrate such poor judgment will result in more serious corrective
> action as justified by this sustained complaint. . . . .

*Id.*

Lucke asserts that there was never a legitimate basis for her discipline as she had heard others make similar statements during her training. In addition, she asserts that the MCSO ignored the fact that her supervisor that day, Sergeant Bogdanovich, counseled her and gave her a verbal reprimand for the incident, which by agency rule precluded the MCSO from imposing any additional discipline. Lucke Aff., ¶ 60.

## VI.    Fourth IAU Investigation:  Log Book Incident

Another IAU investigation began in response to a complaint filed by Captain Yankee on January 5, 2006, accusing Lucke of disobeying a direct order given by her supervisor. Morf Decl., Ex. 10 (IAU # 06-001). The complaint alleged that on December 28, 2005, Sergeant Bogdanovich discovered that the log book used to record security and welfare checks had not been completed for Lucke's rounds after an inmate fell in their cell and was injured. When confronted, Lucke explained that she used a method to record her checks on an envelope as she did them and later transferred them to the log. Sergeant Bogdanovich gave Lucke specific orders on how to conduct security and welfare checks and ordered her to log them in her log book as they occurred. *Id*, p. 2. On December 31, 2005, Sergeant Johnson discovered that Lucke had not started her log book in compliance with this order.

Captain McCain investigated the charge and the SORT consisted of Chief Deputy Bishop (who was a Captain at that time), Captain Yankee, and Lieutenant Lindstrand. *Id*. All members of the SORT agreed with Captain McCain's finding that Lucke had failed to comply with Agency Manual Rule 2.16(1), Obey Supervisors. However, they diverged widely on the appropriate action to take as discipline. Lieutenant Lindstrand recommended an upward departure from the base sanction of a five-day suspension to a ten-day suspension because Lucke's actions failed to

conform to basic agency policies concerning security and welfare checks. *Id*. Captain Bishop

recommended only a Letter of Reprimand because Lucke did not act with a direct intent to

disobey her supervisor, but was merely choosing an alternate method of recording her rounds in

an attempt to be efficient. Captain Yankee concurred with Captain McCain's recommendation of

the base sanction of a five-day suspension. *Id*, p. 3. Captain McCain issued his final report on

March 17, 2006.

Interim Chief Deputy Hasler met with Lucke and reviewed the IAU's recommendations.

According to her review dated March 29, 2006, she agreed with the finding that Lucke failed to

obey the "clear and simple" instructions of Sergeant Bogdanovich which "were in reference to an

established and elementary part of the everyday work duties of a corrections deputy." *Id*, p. 11.

She further found that Lucke "did not reflect any sense of responsibility for following the

directions given to her, preferring, instead, to justify the method that she used." *Id*. Chief Deputy

Hasler recommended the base-level sanction of a five-day suspension without pay. *Id*, p. 12.

On July 27, 2006, Sheriff Giusto met with Lucke, Deputy Anderchuk (representing the

union) and Chief Deputy Bishop and imposed a 15-day suspension without pay. *Id*., p. 1. In his

notes from the meeting, Sheriff Giusto stated that he told Lucke that her performance and ability

and willingness to follow supervisory direction was not satisfactory and explained that the recent

series of discipline was resulting in a total lack of confidence by her co-workers and supervisors.

*Id*, p. 13. In his letter imposing the discipline, Sheriff Giusto explained the reason for his

significant departure from the base sanction and the recommendation of IAU as follows:

> Your choice to discount and ultimately ignore the directions of your
> supervisor about your log book entries is incomprehensible. The directions
> were clear and unambiguous. A mere three days later, you again failed to
> fulfill this basic required duty of recording activities performed in a

housing unit.  Your behavior was not simply another instance of
disregarding a supervisor's directions.  In this instance, your failure to start
the log book and record activity exposed the Agency to liability.  I noted
too, in the conference with the Chief Deputy, that you continued to claim
that your actions were acceptable.  I have concluded that you still do not
recognize the requirement to accept direction from supervisors.  Nor do
you comprehend the grievous results that can occur when a deputy chooses
to disregard legitimate directions given by supervisors.

After careful review of the facts surrounding the allegations, I cannot
concur with the corrective action recommended by the Chief Deputy and
the Inspector.  It is my expectation that a fifteen day suspension without
pay will be sufficient to remind you of your obligations as a public safety
employee to comply with the Agency Work Rules and conduct yourself in
a responsible and professional manner.

*Id*, p. 1.

Lucke contends that Sheriff Giusto's explanation is mere pretext for his decision to

discriminate against her on a variety of bases.  She had used her method of recording her safety

and welfare checks without complaint throughout her employment at the MCSO.  She further

alleges that her supervisors were not merely asking her to promptly record her log book entries as

she conducted her rounds, but were, in effect, asking her to falsify log book records by entering

the information in them before she had complete her rounds.  Lucke Aff., ¶¶ 68-71.  Although

there is no mention of this in the IAU documents, Lucke now asserts that she was using the note

taking method to deal with memory problems she was having.  Lucke also notes that she had just

returned from taking two days of FMLA leave to assist her ill father when Sergeant Bagdonvich

issued his command that she change her method of completing log book entries.

///

**VII.    Fifth IAU Investigation: Second Failure to Engage Incident**

14 - OPINION AND ORDER

On January 6, 2006, a fight broke out between two inmates in area 4C at the MCDC. Lucke was present when the fight occurred and failed to take any actions to aid two coworkers (Deputies Bledsoe and Harrington) who responded to break up the fight. Captain Yankee submitted a complaint to the IAU on January 9, 2006, alleging that Lucke's failure to engage and assist her coworkers put them and the inmates at risk for injury. Morf Decl., Ex. 11 (IAU # 06-002). Captain McCain investigated the incident which, in his words, involved "Deputy Lucke's manifest reluctance to assist two co-workers as they entered one of MCDC's Administrative Segregation modules to secure two high-risk inmates." *Id*, p. 16. Captain McCain found that Lucke's explanation for not engaging ranged from "being frightened by one of the inmates involved (Dawson) to believing the situation resolved so safely and quickly that she would have been of little help . . . ." *Id*, p. 17.

Captain McCain determined that Lucke had violated Agency Manual Rules 2.02(1)(a) & (3), Appropriate Action Required, and Rule 2.06 (1)(a), Conduct; Generally. He found her failure to engage "effectively destroyed whatever credibility she had with her co-workers." *Id*. According to Captain McCain, Lucke's perception of the incident differed from every other member involved, and she viewed her role as "a doorwoman who 'helped' by getting out of the way of bigger, stronger male deputies, instead of engaging with her co-workers when they needed it most." Finding no mitigating factors justifying a downward departure, Captain McCain recommended a five-day suspension for each violation.

All three members of the SORT (Captain Yankee and Lieutenants Brosh and Getman) found Captain McCain's findings to be adequately supported. All members of the SORT believed that in addition to a suspension, Lucke should be required to successfully complete some sort of

remedial training before being permitted to go back to work. *Id*, p. 8. Captain McCain issued his final report on March 17, 2006.

Interim Chief Deputy Hasler reviewed the report and issued her recommendation on March 31, 2006. She commented that in her conference with Lucke, "[Lucke] was unable to articulate any reason that she failed to engage along with deputies Harrington and Bledsoe. She stated that she felt it was 'unsafe' to do so." *Id*, p. 5. According to Interim Chief Deputy Hasler, Lucke "not only failed in an essential duty, but increased the risk experienced by her coworkers." *Id*, p. 6. She further found that Lucke continued to demonstrate the same "reluctance" to acknowledge that she had made an error and take responsibility for her actions that she had conveyed in previous IAU investigations. *Id*. Instead, "Deputy Lucke engaged in a continuous effort to justify the decision not to engage, though her explanations were contradictory." *Id*.

Although she initially agreed with the recommended discipline, Interim Chief Deputy Hasler wrote a supplemental report on July 24, 2006, noting that the sanction had been incorrectly calculated in her March 31, 2006 recommendation. Pursuant to Section VII(2) of MCSO Special Order 02-02, the base sanction should be tripled if the member had received prior corrective action for violating a particular work rule three times within four years. As this was Lucke's third violation of Rule 2.06(1)(a) in less than four years, the minimum sanction was a 15-day suspension without pay. However, because this was Lucke's third violation for actions that "endanger the safety and security of Sheriff's Office operations and facilities" and Lucke repeatedly failed to actively engage with her co-workers, she departed from the presumptive 15-day suspension and recommended Lucke's termination. *Id*, p. 4.

On July 27, 2006, Sheriff Giusto met with Lucke and Chief Deputy Bishop about this fifth

IAU investigation as well as the log book incident (IAU # 06-001).  *Id*, p. 2.  His notes state that

he told Lucke he "was very concerned about [Lucke's] willingness to engage on more than just a

physical basis."  This incident appeared to him to be "a clear sign that she was either unwilling or

unable to 'engage' in following direct instructions."  He also "stressed that there was a lack of

confidence in Lucke's ability to work effectively and safely within or outside the jail facilities."

*Id*.  He told Lucke that the MCSO "had gone the extra mile (training) to attempt to make her

successful without positive results," but ultimately agreed to hold IAU # 06-002 in abeyance as

part of a request for accommodation Lucke submitted on July 28, 2006.  Snyder Decl., Ex AA, p.

2.

Lucke asserts that this IAU investigation is another example of her being singled out for

unwarranted discipline.  First, she stresses her legitimate fear of Dawson with whom Sergeant

Parker had directed her to have no contact.  Just one week before the incident, Lucke had received

a subpoena to testify in Dawson's criminal trial.  Lucke Aff., ¶ 75; Snyder Decl.,        Ex. DD.

Lucke's psychologist, Sherry Harden, Psy.D., states that freezing out of fear on this occasion was

"an unusual and specific situation during which an unpredictable response is likely to occur for

any deputy reacting when suddenly confronted by a person who had previously taken them

hostage."  Lucke Aff., ¶ 83; Snyder Decl., Ex. LL.

Second, Lucke claims that other deputies involved in this incident violated MCSO policy

and suffered no discipline.  The fight only broke out because two other deputies released inmate

Dawson from his individual cell into the common area without first placing the other inmate back

into his cell as required.  Additionally, although MCSO policy required at least four deputies to

respond to a fight between two inmates, the deputy in control of the doors opened the door to the

cell, permitting Deputies Bledsoe and Harrington to enter before the appropriate amount of

backup had arrived.  Lucke Aff., ¶¶ 79, 85.

Finally, Lucke claims she was ordered to rewrite her report of the incident to focus on

what she had done wrong.  No one else was required to do so, and no one was required to write a

use of force report for the incident which is required any time a deputy has to use force to control

an inmate, yet she was ultimately disciplined for failing to engage and assist her fellow deputies

in controlling the inmates.  No force was necessary, she claims, because Dawson already had the

other inmate under control when deputies arrived, and he cooperated immediately with the

responding deputies, obviating the need for any further intervention.  *Id,* ¶ 82.

## VIII.    Employment Actions Taken by Multnomah County

On January 13, 2006, shortly after the fifth IAU complaint, the MCSO placed Lucke on

Administrative Leave and assigned her to the Human Resources Department pending the result of

the investigation.  Morf Decl., Ex. 13.  Multnomah County asserts that this decision was made

because Lucke was a danger to herself and to others, and that her continued employment in the

jails was a safety risk.  Hasler Decl., ¶ 8.  In a meeting also attended by Ott, Captain Yankee told

Lucke that she was a danger to herself and other staff.   Lucke Aff., ¶ 88.  Captain Yankee told

her that she "needed to take care of [her] family" and that "we are putting you across the street

until this is cleared up."  *Id*.  Lucke believes this was in reference to the FMLA leave she had

been taking to care for her father.  Lucke Depo., pp. 185-86.

On March 23, 2006, Lucke met with Sheriff Giusto and received the discipline for the

second and third IAU investigations.  Lucke Aff., ¶ 92.  That same day she submitted an FMLA

application to care for her mother which was denied.  *Id.*  At the meeting, Lucke told Sheriff

Giusto that she worked hard but had a lot on her mind as her father was ill.  *Id.*  Sheriff Giusto

responded that she needed a psychiatric exam and that he would send her for one.  *Id.*  Lucke was

scared because she believed Sheriff Guisto used the psychiatric evaulation process to move

people out.

Lucke attended the fitness for duty evaluation with Dr. David Corey on April 20, 2006,

who issued his evaluation on June 2, 2006.  Morf Decl., Ex. 16.  Dr. Corey found no evidence of a

mental disorder or disability that would reasonably account for Lucke's functional impairments

exhibited during the three incidents leading to her first, fourth and fifth IAU complaints.  *Id*, p. 9.

He believed that her reaction to violence was influenced not only by the Dawson incident, but

also by her long history of victimization in the course of her 15-year marriage and by her oldest

son over several years.  However, he found no persuasive evidence that her symptoms had ever

risen to a level that would qualify as a disability under the ADA.  *Id.*  Consequently, he found that

there was no obligation to provide her with a reasonable accommodation because she was not

disabled and the only modification specific to her symptoms would be no contact with inmates, a

specific requirement of the job.  *Id*, p. 10.  Dr. Corey concluded that Lucke had the ability to

comprehend at least retroactively the ramifications and potential harm to herself and others when

policies and safety procedures are not followed, but opined that "[w]hether she is able to

comprehend this during periods of intense fear is doubtful."  *Id.*  He also concluded that Lucke

"does not have the present ability to fully perform the essential functions of the position, although

for reasons of normal personality rather than mental disorder or disablity."  *Id.*

After attending her examination with Dr. Corey, Lucke filed a workers compensation claim due to an "emotional condition resulting from events in the workplace."  Morf Decl.,    Ex. 17 (application dated May 25, 2006); Lucke Aff., ¶ 94.  Lucke gave the date of her injury as "Progressive 12-30-03?"  Multnomah County received Dr. Corey's report on or about June 5, 2006, took Lucke off work for a week, and had her reevaluated by psychiatrist Dr. Ronald Turco, M.D.  Snyder Decl., Ex. MM; Morf Decl., Ex. 27.

On June 12, 2006, Dr. Turco examined Lucke and administered a psychological test. Morf Decl., Ex. 27, p. 1.  Based upon the results, he issued a report two days later finding that Lucke had a recognized, diagnosable emotional disorder which he determined to be "an adjustment disorder with mixed emotional features, primarily depression."  *Id*, p. 6.  The cause of her disorder was Lucke's discomfort and conflict in her workplace stemming from her multiple IAU investigations and conflict with others in the department.  Dr. Turco opined that the events following the December 30, 2003 escape of Dawson appeared to be the major contributing factors to Lucke's response due primarily to Lucke's perception of being harassed, mistreated, and treated in a humiliating and critical fashion.  Dr. Turco gave Lucke's prognosis for recovery as "excellent" because her emotional issues likely would improve substantially "as soon as the employment issue is resolved."  *Id*.  He opined that Lucke was not limited in her work capacity and did not have any psychiatric or psychological limitations with regard to the performance of her duties, but "[w]hether she is capable of performing [her duties] is an entirely separate issue to be evaluated by the employer."  *Id*.  Dr. Turco recommended six months of treatment consisting of psychological counseling on a weekly basis and relatively low dose administration of antidepressants provided that her work situation was resolved.

On June 28, 2006, Dr Turco prepared an addendum to address additional records submitted by Multnomah County.  He reaffirmed his opinion of her psychiatric condition, but noted that "[t]he causation issue . . . is important because this would acknowledge the employer's understanding that this woman has not been competent in the performance of her job duties."  *Id*, p. 10.  He further suggested that "the deficits that she has exhibited would need to be addressed either with retraining or some degree of cooperative resolution on the part of corrections employees as well as Ms. Lucke herself."  *Id*.

Lucke took FMLA leave to care for her father from June 16 through 19, 2006.  Her physician and chiropractor took her off work from June 21 through July 9, 2006 for her own health condition, for which she was also granted FMLA leave.  Snyder Decl., Ex. OO, QQ. During her time off, Lucke sent defendants a tort claims notice (Morf Decl., Ex. 31 (June 22, 2006)), and filed charges of employment discrimination with the Oregon Bureau of Labor and Industries ("BOLI") (Morf Decl., Ex. 19 (June 29, 2006)).

Lucke returned to work on July 10, 2006, and was again assigned to the Human Resources Department.  Three days later, Ott pulled Lucke into a meeting with Chief Deputy Bishop.  Lucke Aff., ¶ 109; Bishop Depo., pp. 97-103.  At that meeting they told Lucke that in their opinion, based on the report of Dr. Corey, Lucke could not perform the essential duties of her job and could not be placed back into the jail.  Therefore, they told Lucke that she would either need to resign or would be terminated.  Lucke maintains that neither Ott nor Chief Deputy Bishop referenced Dr. Turco's findings.  When Lucke refused to resign, they sent her home and stated that she could take six personal holidays that she would lose if she were fired, but that when she returned she would have a meeting with Sheriff Giusto at which she would be terminated.

Lucke went on FMLA leave from July 14 through July 21, 2006 to take care of her father. Morf Decl., Ex. 37, p. 56; Lucke Aff., ¶ 102.  On July 20, 2006, Lucke learned that Multnomah County had denied her workers compensation claim.  Lucke Aff., ¶ 110.

BOLI notified the MCSO of Lucke's complaint by letter dated July 12, 2006, addressed to Ott at the Human Resources Department.  Morf Decl., Ex. 19.  Ott claims that she was unaware of the complaint until she read it on July 24, 2006.  Ott Decl., ¶ 12.  Also on this date Ott claims she was first made aware that Lucke alleged different treatment and retaliation on the basis of sex, age, and disability.  *Id*.  Ott immediately wrote Lucke a letter asking if she was requesting an accommodation based on a medical condition.  *Id*; Morf Decl., Ex. 20.  Lucke responded by hand delivering a letter to Ott on the morning of July 28, 2006.  Morf Decl., Ex. 12.  That letter requested four accommodations based on Lucke's medical condition: (1) allow her to keep her job as a corrections deputy; (2) allow her to continue with psychological counseling for at least six months; (3) reevaluate her fitness for duty after the six-month period; and (4) consider reassigning her to MCIJ because she was being subjected to hostile conduct by Sergeants Parker and Bogdanovich.  *Id*, p. 1.  Lucke included a number of documents with her letter including a report by her psychologist Michele Ballering, Ph.D., who diagnosed Lucke with Adjustment Disorder with Mixed Anxiety and Depressed Mood.  Morf Decl., Ex. 26.

On July 27, 2006, Lucke met with Sheriff Giusto, Chief Deputy Bishop, Ott and Lucke's union representative.  Morf Decl., Ex. 10, p.13; Lucke Aff., ¶ 71.  At this meeting Sheriff Giusto informed Lucke he was imposting a 15-day suspension as discipline in response to IAU # 06-001 (log book incident).  Lucke also asserts that Sheriff Guisto made a statement to the effect that:

> I will not accommodate you.  You have to be a full working deputy.  It is a full service job.  If you can't be a fully functioning deputy, I don't want you in the jails.  I won't make the accommodation.

Morf Decl., Ex. 21, p. 12; Lucke Aff., ¶ 114.

Sheriff Giusto does not recall making this statement and states that even if he did refer to accommodation, he did not do so in the sense that a lawyer would (as a term of art under the ADA), but was referring to his concern that Lucke was not able or willing to do her job.  Giusto Decl., ¶ 11.  Furthermore, Sheriff Giusto avers that he was not aware that Lucke had been diagnosed with a mental illness at that time.  *Id*, ¶ 12.  Chief Deputy Bishop also does not recall Sheriff Giusto making this statement.  Bishop Depo., p. 117.

On August 2, 2006, Lucke wrote a letter to Sheriff Giusto outlining the discrimination, harassment and retaliation to which she had been subjected to throughout her tenure at the MCSO.  She also discussed her diagnosis with and treatment for her mental disorder.  She ended her letter by requesting certain accommodations which included retention of her corrections deputy job, continued counseling, further training, and a review of her performance at the end of six months.   Morf Decl., Ex. 21.

On August 10, 2006, Lucke filed this lawsuit.  The next day, the MCSO responded to Lucke's letter by agreeing to grant some of the accommodations she requested.  Morf Decl., Ex. 22.  While disagreeing that Lucke had a disability, it was willing to develop a "plan of action" to meet their mutual needs.  The MCSO required her to report for duty on Friday, August 18, 2006 and agreed to allow her to continue to pursue psychological counseling on her own time and at her own expense; to provide her with additional training; to reevaluate her fitness for duty at the end of six months; and to hold her fifth disciplinary action in abeyance for six months.  *Id*.

IX.    **Return to Work as a Corrections Deputy**

On August 19, 2006, Lucke reported back to work at MCDC and was enrolled in the

FTEP training program.  Lucke Depo., p. 142.  Chief Deputy Bishop told her that she would be

under a microscope and that any unsafe behavior would result in her being pulled back over to the

Human Resources Department for the remainder of the six-month period.  Lucke Aff., ¶ 118.

Lucke believes that during the retraining, the trainers were extra hard on her.  *Id*, ¶ 119.  She

states that she again was made to work in a hostile work environment by being put back on

graveyard shift with Sergeant Parker, Sergeant Bogdonovich, and another one of her persecutors,

Deputy Hathaway.  *Id*.  Lucke filed another BOLI complaint on September 5, 2006.  Morf Decl.,

Ex. 29.

Deputy Lucke contends that she successfully completed all three phases of her FTEP

training at the MCIJ after only three months.   Lucke Aff., ¶ 123.  However, the notes from the

training commander indicate that she had some issues in the areas of decision making, problem

solving and officer safety which were not fully resolved and which, had she been a new hire,

would have required further training.  Snyder Decl., Ex. XX.  Multnomah County returned Lucke

to regular duty in November 2006 on the graveyard shift at MCDC.  Lucke Aff., ¶ 123; Ott Decl.,

¶ 17.  This was the same shift and location she worked prior to being placed on administrative

leave.  Ott Decl., ¶ 17.

During her retraining process, Lucke was contacted by the IAU in response to the

complaints of discrimination and harassment raised in her August 2, 2006, letter to Sheriff Giusto.

Snyder Decl., Ex. UU.  According to Lucke, at a meeting between her, her union representative

and IAU investigators Sergeant Moore and Sergeant Shaut, the two sergeants ordered her to

produce all documents that supported any claim she had for employment discrimination.  Lucke

Aff., ¶ 122.  In a letter dated November 21, 2006, the IAU concluded that many of her allegations

were untimely and that some of them appeared to focus on peer to peer relationships within the

Corrections Division that, although difficult, did not rise the threshold necessary for a formal

investigations.  *Id*.  A few of her complaints were forwarded to managers for further investigation.

*Id*.  Lucke believes the investigation into her complaints was deficient.

**X.    Sixth IAU Investigation:  Failure to Secure Personal Weapon**

On January 19, 2007, Lucke was awarded a "G" shift post after participating in the

ordinary shift bidding process held at the end of the year. Ott Decl., ¶ 17;  Lucke Aff., ¶ 131.  On

January 23, 2007, Lucke left her personal off-duty weapon loaded and unattended in the women's

locker room in the MCIJ.  Morf Decl., Ex. 25 (IAU # 07-005).  Although the locker room is

locked, it can be accessed by deputies, civilian staff, staff family members, contractors and

inmates who are assigned to clean the area.  The locker room is accessed by a key pad and

inspected by a deputy before inmates clean it.  Lucke Aff., ¶ 131.  Lucke went home after her

shift and slept for a few hours.  *Id*, ¶ 132.  When she woke up, she had a message to call the jail.

She did and learned that she had left her gun at work.  She immediately returned to the jail and

retrieved her weapon.  *Id*.

Captain Adgers submitted a complaint to the IAU on January 25, 2007, which Captain

Hasler investigated.  Captain Hasler and the SORT agreed that Lucke had violated Agency

Manual Rule 12.22(2), Secure Storage of MCSO Firearms, Rule 12.22(3), Secure Storage of

MCSO Firearms, and Rule 2.06(1)(a), Conduct Generally.  During the investigation, Lucke

manifested a lack of knowledge as to whether her gun was loaded and was not aware that it was

loaded with training ammunition, which is only to be used at the firing range.  On May 30, 2007,

the IAU issued its final recommendation to terminate Lucke.  *Id*, p. 7.

On June 25, 2007, Chief Deputy Bishop met with Lucke, Sergeant Miller from the IAU,

and Sergeant Bjork with the union to discuss the IAU's recommendations.  Lucke asked Chief

Deputy Bishop to consider her successful FTEP and UNET training in making his determination.

Chief Deputy Bishop pointed out that she had not passed the first unit of the FTEP training and

was only processed through the additional two units in response to her request for retraining.  *Id*,

p. 2.  Sergeant Bjork cited several incidents in which similar behavior, in her opinion, had

resulted in lesser forms of discipline.  Chief Deputy Bishop disagreed that they were similar.  *Id*,

p. 2.  He placed Lucke on Administrative Leave pending a decision by Sheriff Giusto.

## XI.    **Termination and Grievance**

On June 27, 2007, Sheriff Giusto met with Lucke and issued her termination.  *Id*, p. 1.

According to Lucke, Sheriff Giusto stated at this meeting that she did not have good judgment,

that there was no pattern or evidence that anyone was out to get her, and that he didn't want any

"half-employees" working for the MCSO.  Lucke Aff., ¶ 155.  Sheriff Giusto's letter issuing the

termination states that the corrective action of termination:

> is necessary because of the significance of your conduct, which resulted in
> an investigation and ultimately sustained findings, as outlined in IAU Case
> # 07-005. . . . The sustained findings are based on evidence that you left
> your loaded MCSO firearm, as defined by the Agency Manual, unsecured
> in the women's locker room at the Multnomah County Inverness Jail with
> no consciousness of its absence.  This action was coupled by the fact that
> the area where the loaded firearm was left unsecured is accessible to
> deputies, civilian staff, staff family members, contractors and inmates who
> are assigned to clean the area.

Morf Ex. 25, p. 1.

The Multnomah County Correction Deputies Association filed a grievance protesting Lucke's discharge. Morf Decl., Ex. 35. Of the six disciplinary actions taken against Lucke during her tenure at the MCSO, this was the only one for which the union filed a grievance. An arbitration was held on March 18, 19 and 21, 2008. On June 11, 2008, the Arbitrator issued her award, finding that Multnomah County had just cause to discharge Lucke. *Id*, p. 31.

Lucke claims that both her meeting with Chief Deputy Bishop and Sheriff Giusto were in close proximity to the date their depositions were scheduled for this lawsuit. Lucke Aff., ¶ 151.

## XII.    **Workers Compensation Appeals**

Prior to being terminated, Lucke appealed the denial of her workers compensation claim. After a hearing on February 23, 2007, the ALJ for the Workers Compensation Board issued a decision dated July 25, 2007, that Lucke had proven by clear and convincing evidence that the major contributing cause to her diagnosed mental illness was her perception of harassment by supervisors and her treatment by coworkers. Snyder Decl., Ex. D., p. 5. The ALJ also found that Sergeant Parker's treatment of Lucke was not merely an interpersonal conflict, but a several year attack by a supervisor who created a hostile work environment for Lucke. *Id*. The ALJ refused to speculate on the "catalyst" for Lucke's treatment. *Id*.

Multnomah County appealed the ALJ's decision. On August 19, 2008, the Workers Compensation Board reversed the ALJ's decision in a two to one decision, finding the evidence insufficient to support Lucke's claim. Morf Decl., Ex. 51. Lucke filed a petition for judicial review on August 27, 2008. Snyder Supp. Dec. (docket #100), Ex. B.

///

///

**XIII.    Interim Order and Defendants' Motion to Reconsider**

After hearing oral arguments, this court issued an Interim Order on August 21, 2008,

granting and denying defendants' motion for summary judgment based upon the court's analysis

of the issues at that time (docket #92).  Because at least some of Lucke's claims would survive

summary judgment, the court desired to give the parties the maximum amount of time possible

for trial preparation while awaiting the completion of supplemental briefing on the issue of

Lucke's hostile work environment claim under the ADA (docket #89).  The Interim Order

notified the parties that after the supplemental briefing was complete, the court would issue a final

Opinion and Order, fully explaining its August 21 ruling and adding a ruling on the hostile work

environment claim.

In their supplemental brief filed just before the court issued the Interim Order, defendants

notified the court of the August 19, 2008 decision of the Workers Compensation Board

("Board").  *See In re Lucke*, WCB Case No. 06-05459 (August 19, 2008) (Morf Decl., Ex. 51).

Because they believed this decision precluded many of Lucke's claims, they filed a Motion to

Reconsider Interim Order and to Extend Pretrial and Trial Deadlines (docket #93).  After hearing

oral argument on August 25, 2008, the court agreed to extend the pretrial deadlines but deferred

its ruling on the Motion to Reconsider until the issuance of its final Opinion and Order (docket

#97).  Lucke's supplemental briefing, submitted on August 27, 2008, addressed both the

preclusion and hostile work environments claim.  This court permitted defendants to file a reply

brief which they submitted on September 4, 2008.  Therefore, all issues have been exhaustively

briefed.

///

///

# <u>DISCUSSION</u>

The central issue to be decided in this case was whether the treatment Lucke received while employed with Multnomah County violated any of Lucke's rights under federal or state law. Lucke believes that following the Dawson escape incident, she was subjected to harassment and ridicule by some of her co-workers and supervisors. This harassment continued throughout her employment as a corrections deputy with the result that she was supervised much more closely than other corrections deputies. Even the slightest mistake would result in disciplinary action being taken against her while other deputies who made similar mistakes suffered no consequences. According to Lucke, her treatment was part of a concerted effort to "document her out" of a job.

Conversely, defendants deny that any such campaign or concerted effort exists. Instead, they submit that Lucke received legitimate progressive discipline for repeated mistakes she made that affected the safety and security of their jails. In their view, her repeated violations of agency rules and policy demonstrated that she did not possess the capacity to perform the essential duties of her job, resulting in her ultimate termination. While they do not deny that Lucke may have had conflicts at times with other staff, they contend that there is no evidence that her treatment or any of her disciplinary sanctions were based upon impermissible discrimination.

The court's analysis will proceed by first addressing several preliminary issues and will then address whether the record presents a genuine issue material fact that defendants violated Lucke's rights under the ADA, FMLA, Title VII, § 1983, or their Oregon analogues.

///

///

**I.      Preliminary Issues**

      **A.      Motions to Strike and Reconsider**

Defendants filed a Motion to Strike (docket #80) significant amounts of the evidence Lucke submitted in opposition to their motion for summary judgment.  While many of the arguments in this motion are well-taken, this court declines to issue a ruling on each individual piece of evidence.  Instead, it has evaluated the evidence in light of the relevant rules of evidence and FRCP 56.

In addition, defendants' Motion to Reconsider Interim Order (docket #93) is also denied. This court did not intend the Interim Order to be the final order on defendants' motion for summary judgment.  Rather, it issued the order in the interest of permitting both parties maximum time to prepare for trial after concluding, based upon its initial evaluation of the parties' arguments and submissions, that trial was inevitable.

      **B.      Issue Preclusion**

Defendants assert that the August 19, 2008 decision of the Board precludes Lucke's claims based on discrimination, retaliation and harassment.  Before the Board's decision, Lucke urged this court to consider the ALJ's findings to avoid possible inconsistent findings of fact due to the preclusive effect if the Board affirmed the ALJ.  Now that the Board has reversed the ALJ's findings, Lucke asserts instead that the Board's decision has no preclusive effect because the issues before the Board and this court are not identical and the Board's decision is not final.

        **1.      Legal Standards**

This court must apply Oregon law in determining the preclusive effect of state court judgments. *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 US 75, 81 (1984) (citation omitted); *Bugna v. McCarthur (In re Bugna)*, 33 F3d 1054, 1057 (9th Cir 1994). "Issue preclusion arises in a subsequent proceeding when an issue of ultimate fact has been determined by a valid and final determination in a prior proceeding." *Nelson v. Emerald People's Utility Dist.*, 318 Or 99, 103, 862 P2d 1293, 1296 (1993) (citation omitted); *see also N. Clackamas Sch. Dist. v. White*, 305 Or 48, 53, 750 P2d 485, 487 (1988) ("If a claim is litigated to final judgment, the decision on a particular issue or determinative fact is conclusive in a later or different action between the same parties if the determination was essential to the judgment.") (citation omitted).  Issue preclusion can be extended to a state agency's fact-finding and legal determinations, even if unreviewed, so long as:  (1) they would be entitled to preclusive effect in that state's courts; (2) the agency acted in a judicial capacity to resolve disputed issues of fact properly before it; and (3) the parties had an adequate opportunity to litigate those issues. *Olson v. Morris*, 188 F3d 1083, 1086 (9th Cir 1999); *Miller v. County of Santa Cruz*, 39 F3d 1030, 1032-33 (9th Cir 1994), *cert denied*, 515 US 1160 (1995).

To determine whether issue preclusion applies, this court must apply the following five-factor test set forth in *Nelson*:

> If one tribunal has decided an issue, the decision on that issue may preclude relitigation of the issue in another proceeding if five requirements are met:
>
> 1. The issue in the two proceedings is identical.
>
> 2. The issue was actually litigated and was essential to a final decision on the merits in the prior proceeding.
>
> 3. The party sought to be precluded has had a full and fair opportunity to be heard on that issue.

4. The party sought to be precluded was a party or was in privity with a party to the prior proceeding.

5. The prior proceeding was the type of proceeding to which this court will give preclusive effect.

*Nelson*, 318 Or at 104, 862 P2d at 1296-97 (citations omitted).

### 2.    **Analysis**

There is no dispute that the Board operated in a judicial capacity to resolve Lucke's workers compensation claim and that both Multnomah County and Lucke had an adequate opportunity to litigate those issues. Furthermore, Oregon courts hold, in general, that issue preclusion applies to workers compensation proceedings. *Drews II v. EBI Cos.*, 310 Or 134, 142, 795 P2d 531, 536 (1990). In addition, this district has held on multiple occasions that such proceedings can be given preclusive effect in subsequent federal employment discrimination suits. *See, e.g.*, *Scott v. Sears, Roebuck & Co.*, 395 F Supp2d 961, 972 (D Or 2005); *Otsyula v. Intel Corp.*, 2007 WL 505691 (D Or Feb. 12, 2007). However, issue preclusion does not apply in this case because the first and second *Nelson* factors are not met.

Starting with the second factor, there has been no final judgment to which this court must give preclusive effect. In *Drews*, the Oregon Supreme Court addressed when a decision in a workers compensation proceeding is final for purposes of issue preclusion. The court instructed that "[t]he point at which finality attaches to a statutory administrative proceeding for preclusion purposes will usually be governed by statutory provisions." *Drews*, 310 Or at 142-43, 795 P2d at 536-37. After reviewing the applicable statutes, the court held:

> A claim determination is not final until hearing and judicial review rights are barred or exhausted. The statutory scheme indicates that the finality requisite for claim or issue preclusion, against the worker, occurs only when a worker fails to timely request a hearing after a claim denial, a

> determination order, or a notice of claim closure, . . ., or by failure to file a
> timely appeal to the Board, . . ., or the courts. . . .

*Id* at 149, 795 P2d at 540 (citations omitted).

According to that rule, finality has not yet attached to the Board's decision for purposes of issue preclusion because Lucke has filed a timely appeal.  Defendants argue that this is an incorrect interpretation of *Drews* for the reasons discussed in *Scherzinger v. Portland Custodians Civil Svc. Bd.*, 196 Or App 384, 393, 103 P3d 1122, 1127-28 (2004), *decision vacated by Sherzinger v. Portland Custodians Civil Svc. Bd.*, 340 Or 483, 135 P3d 318 (2006).  In *Scherzinger*, appellants sought to avoid the preclusive effect of an adverse decision by the Employment Relations Board ("ERB") on a later proceeding before the Custodians Civil Service Board ("CCSB").  The appellants argued that the ERB decision had no preclusive effect because it was on appeal at the time of the CCSB's decision and the trial court's review of that decision, citing *Drews* for the proposition that "a judgment is conclusive unless it is on appeal or direct review."  *Sherzinger*, 196 Or App at 393, 103 P3d at 1128.  The court rejected this reading of *Drews* pointing out that *Drews* also held that a "'valid and final personal judgment is conclusive between the parties, except on appeal or other direct review.'"  *Id*, quoting *Drews*, 310 Or at 141, 795 P2d at 535.   Instead, the court found that "a valid final judgment binds the parties for all purposes except for the purpose of challenging the judgment on appeal or direct review.  The pendency of an appeal does not, however, prevent a judgment from having preclusive effect."  *Id*, citing *Ron Tonkin Gran Turismo v. Wakehouse Motors*, 46 Or App 199, 207, 611 P2d 658, 662 (1980).

This court rejects defendants' argument because *Sherzinger* is inapposite to this case. *Scherzinger* did not address the preclusive effect of an issue decided in a workers compensation

proceeding.  Rather, it responded to the overly broad and incorrect argument that pursuant to
*Drews,* judgments could not have preclusive effect when being appealed.  *Drews'* holding was
much more narrow and addressed the very specific issue of, in light of the unique framework set
forth in Oregon's workers compensation statutes, the point at which finality attached to a workers
compensation proceeding for purposes of issue preclusion.  *Scherzinger,* on the other hand,
addressed a different statutory framework and neglected to discuss whether that framework
contained rules pertaining to the preclusive effect of judgments of the ERB.  The case relied on by
*Scherzinger* is also inapplicable because it addressed the preclusive effect afforded to a civil
judgment while the claim is pending on appeal.  *See Ron Tonkin*, 46 Or App at 207-08, 611 P2d at
662.

        Moreover, the rule providing the basis for decision in *Ron Tonkin*, that the pendency of an
appeal does not prevent a final judgment from having preclusive effect, was the law in Oregon
both before and after *Drews* was decided.  *See Jaloff v. Auto Indemnity Exch.*, 121 Or 187, 253 P
883 (1927); *Gruett v. Nesbitt*, 172 Or App 113, 123, 17 P3d 1090, 1095, *rev withdrawn*, 332 Or
536 (2001).  Nevertheless, *Drews* recognized that finality for purposes of a statutory
administrative proceeding is governed by statutory provisions, not these cases, and held that the
statutory provisions governing workers compensation proceedings did not render a decision final
for purposes of issue preclusion until the defendant's statutory rights to review were exhausted or
had expired.  Thus, while the general rule is that the decision of a trial court or administrative
body may be afforded finality notwithstanding the pendency of further levels of review, the

statutory framework governing workers compensation proceedings creates an exception which

was recognized in *Drews* and applies to this case.[2]

Even if defendants correctly interpret *Drews*, issue preclusion would still not apply

because the first *Nelson* factor is not met. The issue before the Board is not the same as the issue

before this court because Lucke bore a significantly higher burden of proof in the proceeding

before the Board. The primary issue before the Board was whether Lucke's mental disorder was

compensable under the workers compensation statutes. A mental disorder is not compensable

unless the employee establishes several factors. *See, generally*, ORS 656.802. Most relevant to

this case are those factors set forth in ORS 656.802(3) which provides:

> Notwithstanding any other provision of this chapter, a mental disorder is
> not compensable under this chapter unless the worker establishes all of the
> following:
> (a) The employment conditions producing the mental disorder exist in a
> real and objective sense.
> (b) The employment conditions producing the mental disorder are
> conditions other than conditions generally inherent in every working
> situation or reasonable disciplinary, corrective or job performance
> evaluation actions by the employer, or cessation of employment or
> employment decisions attendant upon ordinary business or financial cycles.
> (c) There is a diagnosis of a mental or emotional disorder which is
> generally recognized in the medical or psychological community.
> (d) There is clear and convincing evidence that the mental disorder arose
> out of and in the course of employment.

ORS 656.802(3).

Lucke asserted that her mental disorder arose out of unfair and unreasonable discipline

and mistreatment by co-workers and supervisors. Therefore, the Board determined that "the issue

of whether the employer's disciplinary actions were 'reasonable disciplinary actions' is

---

[2] This court disagrees with *Scott*, 395 F Supp2d at 971, which held the opposite on this issue, but without discussing the rule of *Drews*.

dispositive." *In re Lucke*, pp. 3-4.  The Board next assessed each discrete employment action

alleged by Lucke as unreasonable, considering them "'as a whole' and in context," and

determined Multnomah County's actions were reasonable.  *Id*, pp. 4-6.  Because the medical

evidence in support of her claim did not factor out these "reasonable disciplinary and job

corrective contributors," the Board held that she had not met her burden of proving her claim by

*clear and convincing* evidence.  *Id*, p. 6.  In contrast, in this case, Lucke need only prove her

claims by a preponderance of the evidence.

The Oregon Supreme Court has held that collateral estoppel (issue preclusion) does not

apply where the burden of proof is higher in the second proceeding than it was in the first.  *In re*

*Gygi*, 273 Or 443, 448, 541 P2d 1392, 1395 (1975).  In reaching this decision, the court cited the

RESTATEMENTS (SECOND) JUDGMENTS, § 68.1(d) (Tent. Draft No, 1, March 28, 1973)[3] which

provided that issue preclusion did not apply where "[t]he party against whom preclusion is sought

had a significantly heaver burden of persuasion with respect to the issue in the initial action than

in the subsequent action; the burden has shifted to his adversary; or the adversary has a

significantly heavier burden than he had in the first action . . . ."  Because the burden of proof in

the proceeding before the court was significantly higher than the action for which the adversary

sought preclusion, the court followed the rule stated in the third clause and held that it would give

no preclusive effect to the prior proceeding.  *In re Gygi*, 273 Or at 448, 541 P2d at 1395.

Although the specific holding of *Gygi,* relying on the third clause of the RESTATEMENTS

rule, is not on point, the rule cited in the first clause is.  The two rules are supported by the same

---

[3]The current statement of this rule is found at RESTATEMENTS (SECOND) OF JUDGMENTS, § 28(4) (1982) which adopted
the language of the Tentative Draft for this rule.

rationale.[4]  Therefore, it is highly likely that the Oregon Supreme Court would follow that rule as

well.  *See Vestar Dev. II v. Gen. Dynamics Corp.*, 249 F3d 958, 960 (9th Cir 2001).  Where a

tribunal finds that a party has established an issue under a low burden of proof in one proceeding,

it would be unreasonable to permit that party to use the tribunal's findings in the earlier

proceeding to establish the same issue in a second case requiring a higher burden of proof.  That

was the case in *Gygi*.  Assuming no other rule bars their attempt, it would be equally

unreasonable for a tribunal to preclude a party from attempting to prove an issue in a second

proceeding simply because another tribunal has found that the party failed to establish that issue

under a higher burden of proof in an earlier proceeding.  That is the case here.[5]

        Defendants seek to distinguish this case from *Gygi*, by arguing that they are relying on the

factual findings made by the ALJ, and not necessarily on the ultimate issue of whether Lucke's

mental disorder arose from her employment.  Citing *Garcia v. SAIF Corp.*, 187 Or App 51, 57, 66

P3d 522, 525 (2003), defendants argue that the standard of proof on factual findings is only

"substantial evidence," which is not a heavier burden than applies in this case.  In doing so,

---

[4] RESTATEMENTS (SECOND) OF JUDGMENTS, § 28, comment (f) provides:
> Differences in the burden of persuasion (Subsection (4)). To apply issue preclusion in the cases
> described in Subsection (4) would be to hold, in effect, that the losing party in the first action
> would also have lost had a significantly different burden been imposed. While there may be many
> occasions when such a holding would be correct, there are many others in which the allocation and
> weight of the burden of persuasion (or burden of proof, as it is called in many jurisdictions) are
> critical in determining who should prevail. Since the process by which the issue was adjudicated
> cannot be reconstructed on the basis of a new and different burden, preclusive effect is properly
> denied. This is a major reason for the general rule that, even when the parties are the same, an
> acquittal in a criminal proceeding is not conclusive in a subsequent civil action arising out of the
> same event.

[5] *Munsell v. Hampton Lumber Mills*, 2004 WL 2331995, *1-3 (D Or Oct. 12, 2004), cited by defendants, is not
applicable to the facts of this case.  In *Munsell*, the plaintiff argued that findings made by the ALJ in his favor in an earlier
workers compensation proceeding were preclusive in the subsequent civil litigation, and the court agreed.  *Munsell* is the logical
converse to the case at hand.  Where the plaintiff is able in a prior proceeding to establish an identical issue under a heavier
burden of proof, it is reasonable to permit the plaintiff to assert that relitigation of that same issue is barred by issue preclusion in
a subsequent proceeding where she bears a lower burden of proof on that same issue.

37 - OPINION AND ORDER

defendants conflate the deferential standard of review an appellate court applies to findings made

by the Board (or ALJ) with the heavy burden of proof ultimately carried by plaintiff to prove her

claim.  *Compare* ORS 183.482(8)(c) ("Substantial evidence exists to support a finding of fact

when the record, viewed as a whole, would permit a reasonable person to make that finding"),

*with Hoechlin-Cogburn v. U-Lane-O Credit Union*, 110 Or App 577, 580, 823 P2d 451, 452

(1992) ("to establish a mental stress claim under ORS 656.802(1)(b), a claimant must prove by

clear and convincing evidence that her work was its major contributing cause").  Moreover,

where issue preclusion does not apply to the ultimate issues decided in a case, "the findings of

fact made in [that] case become irrelevant" and, thus, "cannot be introduced to prove facts at issue

in a subsequent proceeding."  *Gygi*, 273 Or at 449, 541 P2d at 1395 (citations omitted).

Consequently, defendants cannot use the Board's conclusions to prove that their actions were not

motivated by discriminatory animus.

### 3.    <u>Conclusion</u>

This court rejects the defendants' argument that issue preclusion applies to this case.

While, not all decisions in this district are in agreement, s*ee Scott*, 395 F Supp2d at 969-72;

*Otsyula*, 2007 WL 505691 at *4-5, none of those cases addressed *Gygi*, and the only case this

court has found which does agrees with this court's conclusion.  *See Tan v. Oregon*, 2008 WL

3871739, *2-3 (D Or Aug. 20, 2008).

### C.    <u>Tort Claims Notice</u>

Lucke's state law claims (Fourth, Seventh, Ninth, Tenth, and Eleventh) are subject to the

limitation that Lucke provided Multnomah County timely notice of her claims pursuant to the

Oregon Tort Claims Act ("OTCA").  ORS 30.275; *Orr v. City of Eugene*, 151 Or App 541, 543,

950 P2d 397, 398 (1997).  This notice must be provided within 180 days of the alleged loss or

injury.  ORS 30.275 (2)(b).  The OTCA expressly describes the methods by which proper notice

can be provided, including the filing a formal notice of a claim or the commencement of an

action.

Lucke's initial Compliant provided Multnomah County with actual notice of her claims

asserting discrimination, retaliation and hostile work environment on the basis of sex or gender.

Multnomah County claims that this was the first notice it received of these claims, such that the

180-day period began before that date.  However, Lucke earlier provided formal notice on or

about June 22, 2006, in a letter titled "TORT CLAIMS NOTICE" which stated that "Lucke has

claims against Multnomah County both in common law tort and statutory claims for age, gender,

and disability."  Morf Decl., Ex. 31; *see* ORS 30.275(3)(a), (4).  Thus, the limitations period for

purposes of Oregon claims of sex or gender discrimination extends back to December 24, 2005.

Defendants also assert that Lucke first provided proper notice of her OFLA claim against

Multnomah County when she filed the First Amended Complaint on February 13, 2007.  If so,

Lucke cannot assert any claims based upon OFLA violations occurring before August 17, 2006,

180 days before the filing of the First Amended Complaint.  In addition, they argue that neither

the First nor Second Amended Complaints provided any notice of any other actions alleged by

Lucke at her deposition based on frequent medical leave.  Lucke counters that her first BOLI

complaint and August 2, 2006 letter to Sheriff Giusto provided "actual notice" of her claim.

Defendants dispute that either of these qualify as adequate "actual notice" under the OTCA.

A BOLI complaint does not provide actual notice of a plaintiff's intent to file a lawsuit

because a plaintiff is not required to file a BOLI complaint prior to filing an employment

discrimination suit under state law.  See OAR 839-003-0020(1); *see also Birchard v. City of Portland*, CV 00-1017-RE, Opinion and Order, p. 27 (D Or December 7, 2001).  Furthermore, the letter to Sheriff Giusto, while it does specifically mention her medical leave, does not express an intent to file a claim.  Thus, neither notice satisfies the OTCA.

Although Lucke did not advance this argument, this court finds that she provided actual notice of her OFLA claim with the filing of her initial Complaint.  That Complaint asserted a medical leave claim under FMLA.  A reasonable person reading the Complaint would understand that Lucke intended to assert a claim for medical leave discrimination against Multnomah County.  The allegations of the initial complaint are more than adequate to give Multnomah County "actual knowledge of the time, place and circumstance" of claims premised on the use of medical leave. ORS 30.275(6); *Flug v. Univ. of Or.*, 335 Or 540, 553, 73 P3d 917, 924 (2003).  Later amendment of the Complaint to add claims arising under Oregon law is of no consequence under these circumstances.  Therefore, Lucke's OFLA claim includes acts 180 days prior to the filing of the initial Complaint.

### D. Continuing Violations Doctrine

With respect to the Fifth Claim alleging a violation of Title VII, defendants move to exclude all evidence of events that occurred over 240 days prior to Lucke's filing of her first BOLI complaint, or prior to November 1, 2006.  42 USC § 2000e-5(e).

In response, Lucke relies on the continuing violation theory applicable to § 1983 claims based on a "series of related acts."  However, in 2002 the Supreme Court limited the reach of the continuing violations doctrine, holding that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  Each discrete

discriminatory act starts a new clock for filing charges alleging that act." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 US 101, 113 (2002).

Although defendants' acts which form the basis of Lucke's Title VII claim may be related, they are discrete acts, each of which allegedly violated her constitutional rights. Consequently, they do not qualify as a continuing violation. Yet, while time-barred acts may not be considered for purposes of liability, evidence of time-barred acts may be considered to prove timely claims. "[T]he statute [does not] bar an employee from using the prior acts as background evidence in support of a timely claim." *Morgan*, 536 US at 113. Accordingly, evidence of events prior to November 1, 2005, may, in the court's discretion, be admitted at trial as background evidence in support of Lucke's timely claims.

## II.    Sixth and Ninth Claims

Lucke concedes that defendants are entitled to judgment as a matter of law on her Sixth (ADEA) and Ninth (Oregon Whistleblower statute) Claims. Therefore, defendants' motion is granted with respect to those claims.

## III.    Discrimination Claims (First, Second, Fifth and Seventh Claims)

Read liberally, Lucke's complaint asserts that Multnomah County discriminated against her because of her gender or sex and her alleged status as a disabled person. Her complaint is less than pellucid on the theories of discrimination she asserts. Read liberally, Lucke asserts a claim for disparate treatment, failure to accommodate, retaliation and hostile work environment under the ADA. However, the allegation in her Title VII claim only support a claim of retaliation. This is confusing as Lucke's state law discrimination claim asserts both a disparate treatment and retaliation claim. It is inconceivable that Lucke would attempt to assert a disparate treatment

claim under one, but not the other.  Thus, in an abundance of caution, this court will address both theories for Lucke's Title VII claim.

### A.    Analytical Framework for Disparate Treatment and Retaliation Claims

Claims for disparate treatment and retaliation under both Title VII and the ADA may be analyzed using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 US 792, 802 (1973).  *See Villiarimo v. Aloha Island Air, Inc.*, 281 F3d 1054, 1062 (9th Cir 2002) (Title VII disparate treatment); *Stegall v. Citadel Broadcasting Co.*, 350 F3d 1061, 1065-66 (9th Cir 2003) (Title VII retaliation); *Raytheon Co v. Hernandez*, 540 US 44, 52-54 (2003) (ADA disparate treatment); *Brown v. City of Tucson*, 336 F3d 1181, 1186-87 (9th Cir 2003) (ADA retaliation).  The parties agree that this is the appropriate framework for analyzing Lucke's First and Fifth Claims

Because Oregon courts have rejected the burden-shifting framework, this court has been uncertain whether to apply *McDonnell Douglas* to state law claims over which it has supplemental jurisdiction, as opposed to diversity jurisdiction.  *See Pasco v. Mentor Graphics Corp.*, 2001 WL 34039104, *15 n4 (D Or Nov. 2, 2001).  However, the Ninth Circuit's decision in *Snead*, 237 F3d at 1092, declared this analysis to be a matter of federal procedural law. Federal procedural law must be applied regardless of the source of the court's jurisdiction over a claim.  *See In re Exxon Valdez*, 484 F3d 1098, 1100 (9th Cir 2007) ("'The *Erie* principles apply equally in the context of pendent jurisdiction.'"), quoting *Mangold v. Cal. Pub. Utils. Comm'n*, 67 F3d 1470, 1478 (9th Cir 1995); *see also*, *Hoyos v. Telecorp Commc'ns., Inc.*, 488 F3d 1 (1st Cir 2007); *Houben v. Telular*, 309 F3d 1028 (7th Cir 2002).  Moreover, Oregon's employment discrimination statutes are generally construed consistently with federal law.  *See* ORS 659A.139

("Claims brought under the Oregon law are "construed to the extent possible in a manner that is consistent with . . . similar provisions of the [ADA]."); *Hess v. Multnomah* County, 216 F Supp2d 1140, (D Or 2001) ("Because ORS Chapter 659 [A] 'was modeled after Title VII ... federal cases interpreting Title VII are instructive.'"), quoting *Harris v. Pameco Corp.*, 170 Or App 164, 176, 12 P3d 524, 532 (2000).  Therefore, Lucke's Second and Seventh Claims must be analyzed under *McDonnell Douglas* as well.

Utilizing this framework, in order to satisfy her *prima facie* case, Lucke must show: (1) she is a member of a protected class or engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal link exists between her status or activity and the employment action.  *See Trent v. Valley Elec. Ass'n Inc.*, 41 F3d 524, 526 (9th Cir 1994); *Steiner v. Showboat Operating Co.*, 25 F3d 1459, 1464 (9th Cir 1994).  Lucke's burden to establish a *prima facie* case "is minimal and does not even need to rise to the level of a preponderance of the evidence."  *Wallis v. J.R. Simplot Co.*, 26 F3d 885, 889 (9th Cir 1994).  The burden then switches to Multnomah County to establish a legitimate, non-discriminatory reason for its actions. *McDonnell Douglas*, 411 US at 802.  If it does so, Lucke must adduce a triable issue of fact that Multnomah County's justifications are a mere pretext for its invidious discrimination.  *Yartzoff v. Thomas*, 809 F2d 1371, 1377 (9th Cir 1987), *cert denied*, 498 US 939 (1990).

### B.    Retaliation Claims: Disability & Sex

#### 1.    *Prima Facie* Case

##### a.    Protected Activity

Throughout her final two years at the MCSO, Lucke filed three separate BOLI complaints. Morf Decl., Exs. 19 (June 12, 2006), 29 (Sept. 15, 2006) & 30 (Aug. 7, 2007).  The first BOLI

complaint asserted that Multnomah County unlawfully discriminated against her in violation of

Title VII (gender), the ADA, FMLA, OFLA, and the ADEA.  The other two asserted the same

basic statutory violations but added additional incidents which allegedly violation Lucke's rights.

Multnomah County concedes that Lucke engaged in protected activity by filing these BOLI

complaints.

### b.  Adverse Employment Actions

At her deposition, Lucke identified the following as adverse actions taken against her

because she made sex and gender-based complaints:  (1) her January 13, 2006 move to Human

Resources (Lucke Depo., p. 262); (2) her 15-day suspension on July 27, 2006 (*id*, pp. 239-40);

and (3) the fact that IAU investigations were "started" against her (*id*, p. 261.).  She also submits

that her "forced retraining" and the "sham investigation" that MCSO conducted into her

complaints of discrimination were also adverse employment actions taken due to her participation

in protected activity.

On a preliminary note, Multnomah County makes a great effort to limit the number of

actions this court may consider as adverse employment actions for her retaliation claims pursuant

to the federal exhaustion requirement and the OTCA.

Multnomah County correctly concludes that alleged adverse employment actions are

barred which fall outside of the charging period or which were not alleged as unlawful actions in

a filing with the EEOC or applicable state agency.  42 USC § 2000e-5; *Ledbetter v. Goodyear

Tire & Rubber Co., Inc.*, 127 S Ct 2162, 2167 (May 29, 2007) ("In addressing the issue whether

an EEOC charge was filed on time, we have stressed the need to identify with care the specific

employment practice that is at issue."), citing *Morgan*, 536 US at 110-11.  Its arguments,

however, are largely academic as Lucke's first protected activity was the filing of her first BOLI complaint.  Therefore, Multnomah County's retaliatory actions could not have been taken until after that date and nearly all of these would fall within both the OTCA and EEOC charging periods.

Multnomah County also asserts that Lucke's "forced retraining" and "sham investigation" allegations are not included in her BOLI charges and, therefore, cannot serve as a basis for liability under Title VII.  Even assuming that they are properly before this court, they are not adverse employment actions.  Lucke has failed to show how granting the accommodations requested in her August 2, 2006 letter to Sheriff Giusto can be an adverse employment action. Furthermore, Lucke's belief that the MCSO did not investigate her claims of discrimination is not an adverse employment action for purposes of her retaliation claims.  To qualify an adverse employment action is an "employer action[] that would have been materially adverse to a reasonable employee . . . . [T]hat means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. and Santa Fe Ry. Co. v. White*, 548 US 53, 57 (2006). Suspending Lucke for 15 days and firing her would dissuade a reasonable employee from reporting discrimination, but permitting an employee to engage in requested retraining and not carrying an investigation through to the outcome desired by the employee would not.

### c.   Causation

"To show the requisite causal link, the plaintiff must present evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Cohen v. Fred Meyer, Inc.*, 686 F2d 793, 796 (9th Cir 1982) (citations omitted).  "[A] prima facie case may

be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff

engaged in protected activities and the proximity in time between the protected action and the

allegedly retaliatory [activity]." *Yartzoff*, 809 F2d at 1376. The showing required to meet this

burden is minimal, but it is "[e]ssential to a causal link . . . that the employer was aware that the

plaintiff had engaged in the protected activity." *Cohen*, 686 F2d at 796.

Lucke's strongest evidence with respect to her ADA retaliation claim is Sheriff Giusto's

comment, made just a few days after Multnomah County was apprised of her BOLI complaint,

that he "would not accommodate" her. By this date, Ott, the Human Resource Director, was

aware that Lucke had been diagnosed with a mental disorder and had filed a BOLI complaint.

Notwithstanding his explanation to the contrary, it is suspicious that a few days later, Sheriff

Giusto would proclaim that he would not accommodate Lucke. As a department head, he would

presumably understand the meaning of accommodation in light of the ADA. Furthermore, it is

reasonable to infer that Morf, the head of the MCSO Human Resources Department, would have

discussed Lucke's BOLI claim with Sheriff Giusto or Chief Deputy Bishop prior to their meeting

to impose discipline on Lucke. Whether Sheriff Giusto knew about the BOLI complaint by then

is an issue for the jury to decide. Furthermore, Sheriff Giusto's and Chief Deputy Bishop's

failure to recall these words being spoken is unavailing as it requires a credibility determination

not appropriate for summary judgment.

Sheriff Guisto also told Lucke that he did not want any "half-employees" working for the

MCSO. Multnomah County disputes that this is evidence of discriminatory intent because the

first person to use this language was Lucke's union representative in an earlier meeting with

Chief Deputy Bishop. *Id*, Ex. 25, p. 2. Even if true, it does not help since, according to Chief

Deputy Bishop's account, the union representative appears to have been referring to the fact that MCSO had accommodated employees with various difficulties in the past and should do so for Lucke. A reasonable juror who believes Lucke could find that at least part of Multnomah County's motivation for terminating Lucke was her disability.

Other than these comments, Lucke relies wholly on the proximity of her BOLI complaints to the actions taken by defendants to establish the causal link for her *prima facie* case for all other bases of retaliation. The Ninth Circuit has held that "when adverse employment decisions are taken within a reasonable period of time after complaints of discrimination have been made, retaliatory intent may be inferred." *Passantino v. Johnson & Johnson Consumer Prods., Inc*, 212 F3d 493, 507 (9th Cir 2000) (citing cases). It is reasonable to infer from the short period of time that passed between Lucke's BOLI complaint and her 15-day suspension that Sheriff Giusto's decision to increase her recommended punishment three-fold was motivated by retaliatory intent. *See Villiarimo*, 281 F3d at 1065 ("[C]ausation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity."); *see also Coszalter v. City of Salem*, 320 F3d 968, 977 (9th Cir 2003) ("Depending on the circumstances, three to eight months is easily within a time range that can support an inference of retaliation."); *Allen v. Ironon*, 283 F3d 1070, 1078 (9th Cir 2002) ("[A]n eleven-month gap in time is within the range that has been found to support an inference that an employment decision was retaliatory.") (citation omitted).

The time between Lucke's termination and the nearest protected activity is much longer, over nine months. Lucke's second BOLI complaint was submitted on September 5, 2006, and the sixth IAU investigation against Lucke was instituted on January 25, 2007, which led to her

termination on June 27, 2007.  However, Lucke argues that her termination was a foregone

conclusion and Multnomah County was only looking for an opportunity to fire her.  Taking the

facts in the light most favorable to Lucke, she has created an issue of fact as to whether her

termination was most likely due to her protected conduct.

### 2.  Multnomah County's Justification

Since Lucke has established a *prima facie* case, the burden now switches to Multnomah

County to articulate a legitimate non-retaliatory reason for the adverse action.  *Cohen*, 686 F2d at

796.  It "need not prove the absence of retaliatory intent or motive; it simply must produce

evidence sufficient to dispel the inference of retaliation raised by the plaintiff."  *Id* (citations

omitted).  This is merely a burden of production as the ultimate burden of persuasion remains

with Lucke at all times.  *Id* at 796-97.

With respect to her 15-day suspension, Multnomah County asserts that it was justified by

direct disobedience in face of lawful order by her supervisor.  Sheriff Giusto's asserted

justification for the suspension was: "It is my expectation that a fifteen day suspension without

pay will be sufficient to remind you of your obligations as a public safety employee to comply

with the Agency Work Rules and conduct yourself in a responsible and professional manner."

Morf. Decl., Ex. 10, p. 1.  Multnomah County also points to the fact that Lucke's failure to

comply with her supervisor's instructions on this occasion were directly related to safety and

security issues in the jail, issues for which she had been disciplined before.  Lucke herself

admitted that one of the reasons Sheriff Giusto had given her the 15-day suspension was because

he was mad at her for exposing the county to liability.  And as pointed out by Multnomah County,

Lucke did not grieve this decision.

Multnomah County gives an equally legitimate reason for Lucke's termination as stated in the Inspector's final report and recommendation and Sheriff Giusto's letter terminating her employment.  In her final findings, Captain Hasler wrote:

> No recommendation for termination comes lightly.  In this case, the SORT members weighed the undisputed facts, the responses provided by Deputy Lucke and the efforts made by the Agency to bring Deputy Lucke up to standard concerning the essential skills needed to be a successful Corrections Deputy and a contributing member of the Agency.  These efforts, though exceptional, have not resulted in Deputy Lucke actually improving her security awareness or her performance.

Morf Decl., Ex. 25, p. 7.

Sheriff Giusto concurred with these findings and wrote that Lucke's termination was justified "because of the significance of your conduct."  *Id*, p. 1.  Multnomah County's position is strengthened by the fact that a labor arbitrator, after hearing three days of testimony and receiving evidence, much of which is identical to that before this court, found Multnomah County had just cause to discharge Lucke.  Morf Decl., Ex. 35, p. 48.

Lucke's poor work performance and violation of agency rules are legitimate justifications for the actions taken by Multnomah County.

### 3.    Pretext

#### a.    Disability

Because Multnomah County has produced legitimate justifications for the adverse employment actions, "the legally mandatory inference of retaliatory discrimination arising from the plaintiff's prima facie case drops away."  *Yartzoff*, 809 F2d at 1377.  The burden of production again falls on Lucke to show that Multnomah County's explanation is a pretext for impermissible retaliation.  *Id*.  "This burden merges with [Lucke's] ultimate burden of persuading

the court that [she] is the victim of retaliation." *Id.* "[A] plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F3d 1115, 1127 (9th Cir 2000) (citation omitted). In considering these, "[e]vidence already introduced to establish the prima facie case may be considered . . . ." *Yartzoff*, 809 F2d at 1377. "When that evidence, direct or circumstantial *consists of more* than the [prima facie] presumption, a factual question will almost always exist with respect to any claim of nondiscriminatory reason[,]" but "in those cases where the *prima facie* case consists of no more than the minimum necessary to create a presumption of discrimination . . . , plaintiff has failed to raise a triable issue of fact." *Wallis*, 26 F3d at 890 (internal quotations, citation omitted) (emphasis and brackets in original). Lucke must do more than simply "establish a prima facie case and deny the credibility of [Multnomah County's] witnesses." *Id* (citation omitted).

Lucke asserts that a jury could find that the disciplinary decisions were pretextual on the basis of timing, Chief Deputy Bishop's statements regarding Lucke not being able to perform the essential functions of her job, and the disparate treatment she received for her fourth and sixth IAU investigations.

Chief Deputy Bishop's conclusion that Lucke could not perform the essential functions of her job was based on the conclusions of Dr. Corey. Lucke maintains that he improperly ignored the contrary conclusions of Dr. Turco. However, Dr. Turco did not opine that Lucke could perform the essential functions of her job. He concluded only that she was not psychologically limited and that the employer would have to evaluate whether she was otherwise limited in her

ability to perform her job.  Therefore, Chief Deputy Bishop's reliance on Dr. Corey's conclusions are not evidence of pretext.

With respect to similarly situated employees being treated more favorably, comparator evidence is one permissible method of establishing pretext.  Lucke bears the burden of showing that the compared employees are similarly situated.  *See Vasquez v. County of Los Angeles*, 349 F3d 634, 641 (9th Cir 2003) ("individuals are similarly situated when they have similar jobs and display similar conduct"); *see also Marquez v. Bridgestone/Firestone*, *Inc.*, 353 F3d 1037, 1038 (8th Cir 2004) (plaintiff is "required to point to individuals who have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.") (quotations, citation omitted);  *Mitchell v. Toledo Hosp.*, 964 F2d 577, 583 (6th Cir 1992) ("It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly-situated *in all respects*.") (emphasis in original) (citation omitted).  In view of this requirement, this court limited discovery on comparators to correction officers who were subject to investigation or discipline regarding the same or similar rule violations during Sheriff Giusto's tenure (docket #59).

As a result, Multnomah County produced three examples, all corrections deputies who were investigated for alleged violations of the MCSO gun policy.  Morf Decl., Exs. 39-41. Deputy Jeffrey Metscher was alleged to have left his firearm improperly secured in his vehicle while attending a sporting event.  His vehicle was broken into and the gun was stolen.  The IAU ultimately did not sustain the alleged rule violations on the basis that he had made the best decision he could to secure his firearm upon realizing that he had it with him by locking it in his

glove box and locking the vehicle.  Deputy Metscher had no prior disciplinary history.  Deputy Judith Hoffman was investigated for leaving her weapon unsecured in her open locker in the female staff locker room at the MCIJ.  The investigation resulted in an oral reprimand.  Deputy Hoffman had no prior disciplinary history.  Deputy Martin Romey was investigated for failing to properly secure his firearm along with additional county property which was stolen from his unsecured vehicle at his home.  The investigation resulted in a one-day suspension.  Deputy Romey had one prior corrective action.

 Multnomah County adequately explains that these three deputies were disciplined according to the facts unique to their case and based upon their own disciplinary history.  Although none received the severe discipline meted out to Lucke (termination), none of them had her extensive disciplinary history, including an unprecedented six sustained IAU investigations over three years, conducted by two different inspectors and involving a number of different SORT members.  Each of these investigators were unanimous in their conclusion that Lucke's misconduct violated specific rules of the Agency Manual, most often related in some way to issues of the safety and security of the jail.  One of the investigations, although being held in abeyance while Lucke attempted to engage in retraining for her job, had already resulted in a recommendation for termination for prior rule violations.  Thus, none of these legitimate comparators raise an inference of pretext.

Lucke has not offered any comparators whose conduct was similar to that for which she was disciplined in her fourth IAU investigation.  Lucke has failed to provide any evidence that the instigation of the IAU investigations served as pretext for Multnomah County's desire to retaliate against her for participating in protected action.

Lucke attempts to evade this court's ruling on proper comparators by offering unsupported hearsay statements that MCSO employees who were either supervisors or non-correction (law enforcement) deputies engaged in "similar" incidents without suffering consequences.  *See* Lucke Aff., ¶¶ 138,140, 143, 150, 159 & 160.  None of these are comparators, and the only evidence Lucke offers for these alleged incidents is her uncorroborated testimony which does not demonstrate any personal knowledge.  Consistent with its prior ruling and the rules of evidence, this court will not consider these proffered "comparators."

Nevertheless, given the close timing of events and comments by Sheriff Giusto made in the context of imposing the 15-day suspension and Lucke's termination, this court finds that Lucke has provided sufficient evidence of pretext to survive summary judgment with respect to her ADA retaliation claim.  This is not a case of timing alone.  The tripling of Lucke's recommended suspension, combined with Sheriff Giusto's statements that "I will not accommodate you" and that he did not want any "half employees" working for the MCSO, is sufficient to raise a genuine issue of fact as to whether his asserted justifications are pretext for retaliating against Lucke for reporting disability discrimination.

### b.    Sex

However, Lucke's Title VII retaliation claim cannot survive.  Lucke's evidence of pretext relates entirely to her alleged disability.  There is no evidence that her complaints of sex discrimination motived the adverse employment actions at issue.  Therefore, Multnomah County's motion is denied with respect to Lucke's Title VI retaliation claim.

///

///

53 - OPINION AND ORDER

C.    **Disparate Treatment: Disability & Sex**

1.    ***Prima Facie* Case.**

a.    **Membership in a Protected Class**

The only dispute with respect to the first element of Lucke's *prima facie* case for her ADA

disparate treatment claim is whether Lucke is a member of a protected class within the meaning

of the ADA.  Multnomah County argues that Lucke is not disabled and also challenges her ADA

discrimination claim on the ground that she did not suffer an adverse employment action *because*

*of* her disability.

The ADA defines disability as:  "(A) a physical or mental impairment that substantially

limits one or more of the major life activities of such individual; (B) a record of such an

impairment; or (C) being regarded as having such an impairment."  42 USC § 12102(2).  For

purposes of its motion, Multnomah County does not challenge Lucke's claim that she has a

mental impairment.  *See* Lucke Depo., p. 202.  However, even assuming that she has a mental

impairment for the purposes of the ADA which in some way limits her activities, Multnomah

County contends that Lucke's claim fails because she is not "substantially limited" in any "major

life activity."

Lucke claims that she is substantially limited in the major life activities of sleeping,

concentration and memory.[6]  Lucke Depo., p. 204.  Each of these is a major life activity.  *See*

*Head v. Glacier Northwest, Inc.*, 413 F3d 1053, 1060-62 (9th Cir 2005) (holding sleeping,

thinking, and reading to be major life activities); *McAlindin v. San Diego*, 192 F3d 1226, 1234

_____

[6]  Lucke stated in her affidavit that she also was limited in reading and sexual relations.  However, she did not identify these limitations in any her pleadings, at her deposition, or in her briefs.  Because she does not explain her change in testimony, the court strikes that portion of her affidavit as sham and will not address these additional claimed impairments.

(9th Cir 1999) (holding sleeping to be a major life activity), *cert denied*, 530 US 1243 (2000). Multnomah County contests Lucke's claim that she suffers substantial limitations in these activities.

It is not enough to simply show that a mental impairment merely affects a major life activity; rather, a plaintiff bears the burden of proving that her impairment causes substantial limitations. In the words of the Supreme Court, "[w]hile the Act addresses substantial limitations on major life activities, not utter inabilities, it concerns itself only with limitations that are in fact substantial." *Albertson's, Inc. v. Kirkingburg*, 527 US 555, 565 (1999) (internal quotations and citation omitted). In order to be substantially limited, a person must be "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 CFR § 1630.2(j)(1)(ii); *see also McAlindin*, 192 F3d at 1235 ("[T]he limitation must be severe or, in other words, substantial when compared to the ability of 'the average person in the general population.'"), quoting 29 CFR § 1630.2(j)(1)(I).

In determining whether an individual is substantially limited in a major life activity, a court should consider "[t]he nature and severity of the impairment;" "[t]he duration or expected duration of the impairment;" and "[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 CFR § 1630.2(j)(2). Substantial impairment should be determined on a "case-by-case basis . . . in terms of the impact of an impairment on 'such individual'[.]" *Albertson's*, 527 US at 566, quoting 42 USC § 12102(2); *see also Thornton v. McClatchy Newspapers, Inc.*, 261 F3d 789, 794 (9th Cir 2001)

("Whether a person is disabled under the ADA is an 'individualized inquiry.'"), quoting *Sutton v. United Air Lines, Inc.*, 527 US 471, 483 (1999). In making this determination, the court must take into account the effects of any mitigating measures employed by the plaintiff. *Albertson's*, 527 US at 565.

### (1). <u>Sleeping</u>

Multnomah County challenges Lucke's assertion that she is substantially limited in the activity of sleeping. As evidence it cites to the following exchange in Lucke's deposition:

> Q:    . . . you said you went to bed around 8:30 or so p.m. --
> A:    Uh-Huh
> Q:    – and then you slept to 4:00 or 5:00. Is that pretty typical for you?
> A.    Yes.

Lucke Depo., p. 128.

If true, then Lucke sleeps between seven-and-a-half and eight-and-a-half hours a night. Thus, she sleeps the recommended eight hours a night and is not substantially limited in this activity. *See McAlindin*, 192 F3d at 1234. However, Lucke counters that this deposition testimony was premised on her misunderstanding of the question posed to her. Had she understood the question properly, she would have responded according to her deposition correction sheet as follows:

> No. I would typically be in bed most of the time, but it would not be typical for me to sleep through the day. I was unable to sleep due to tension, anxiety, and worry or my hemifacial spasm pulling at my lips. I would almost always have fragmented and fitful sleep, waking up frequently, getting up to go the bathroom [sic], or staying in bed watching the clock, hoping to fall asleep again. Adding up the time I actually slept, I typically only slept four hours per night.

Snyder Decl., Ex. QQQ, p. 1.

Multnomah County challenges this correction sheet testimony as a self-serving contradictory statement "offered solely to create a material factual dispute in a tactical attempt to evade an unfavorable summary judgment." *Hambleton Bros. Lumber Co. v. Balkin Ent., Inc.*, 397 F3d 1217, 1225 (9th Cir 2005). Based on the timing and nature of the changes, it moves to strike this testimony. The change in testimony is indeed substantive and paints a different picture of Lucke's ability to sleep. Additionally, the change is suspect because defendants' attorney did not receive the corrections sheet until Lucke submitted her response brief to defendants' motion for summary judgment.

The propriety and adequacy of this correction is governed by FRCP 30(e) which provides a 30-day window to make changes after being notified that the transcript of the deposition is "available" to review. A deponent making changes in form or substance must sign a statement listing the changes and the reasons for making them. FRCP 30(e)(1)(B).

Multnomah County argues that Lucke's efforts to "correct" her deposition testimony are analogous to those rejected in *Hambelton Bros. Lumber*. There the court struck a party's deposition *errata* containing extensive changes to the deposition testimony which was submitted past the 30-day deadline. The court characterized it as an abuse of FRCP 30(e) akin to the Ninth Circuit's "sham" affidavit rule which prohibits a party from creating an issue of fact by an affidavit which contradicts her prior deposition testimony. *Hambelton Bros. Lumber*, 397 F3d at 1225, quoting *Kennedy v. Allied Mut. Ins. Co.*, 952 F2d 262, 266 (9th Cir 1991).

Unlike *Hambelton Bros. Lumber*, Lucke argues that her changes were timely, permissible and not offered in an effort solely designed to defeat summary judgment. On the corrections sheet, she explains that "[w]hen I read my testimony, I realized that I misunderstood what the

attorney was asking me." Lackey Aff. Ex. QQQ, p. 1. The deposition was held on March 28 and April 21, 2008. Although she does not clarify the date on which her deposition transcript was made available, presumably it was after April 21, 2008. According to the date on the corrections sheet, Lucke made the corrections on May 15, 2008, which would fall within the 30-day time limit under FRCP 30(e). *Id*, p. 3. Defendants did not file their motion for summary judgment until May 16, 2008, the day after the corrections were made. Therefore, accepting all the documents at face value, Lucke would not yet have known that defendants would be using her uncorrected deposition testimony in their motion for summary judgment. Furthermore, the office manager for Lucke's attorney avows that she mailed the correction sheet to defense counsel, the court reporter, and Lucke on May 16, 2008. Concho Aff., ¶ 3.

In light of the dates on the documents, this court will not strike the corrections sheet. There is not enough evidence to declare the document a sham affidavit. Furthermore, the correction is similar to Lucke's later deposition testimony with respect to her sleeping patterns. For example, Lucke testified that her sleep is "fractured" and is interrupted by night sweats, jaw clenching and facial spasms. Lucke Depo., p. 204; *see also* Lucke Depo., pp. 210-15. This evidence substantially agrees with the Lucke's affidavit that she suffers from "chronic sleep disruption, almost every night and exhaustion nearly every day . . . ." Lucke Aff., ¶ 124. She also alleges that she took sleep medication prescribed by her doctor which did not resolve her sleeping problems and that she discontinued using the medications on advice from her doctor. *Id*, ¶ 126.

Multnomah County points out that in her deposition, Lucke asserted that she was "physically in very good health for my age," engages in regular exercise, cared for her aging parents which required extensive driving, and routinely accepted voluntary overtime shifts in

addition to her 40-hour work week.  Lucke Depo., p. 208; *see Mortensen v. Pacificorp*, 2007 WL

405873, *9-11 (D Or Feb. 1, 2007) (finding plaintiff was not disabled where plaintiff's testimony

about her work performance and mental abilities contradicted her claim that she was limited in

the major life activity of sleeping).  In addition, when filling out a job application, Lucke checked

a box to indicate that she was not disabled.  Morf Aff., Ex. 46, p. 4.

     Nevertheless, Lucke's deposition and affidavit testimony are sufficient to establish a

genuine issue of material fact as to whether she is disabled.  In *Head*, the court held that the

plaintiff had submitted sufficient evidence to create an issue of fact on this same issue by stating

in his declaration that he "would pass out for a while immediately after getting home from work,"

but was unable to get a full night of sleep, and after he woke up he had "great difficulty going to

sleep when it was time to go to bed for the night."  *Head*, 413 F3d at 1060.  He further testified

that he commonly only got five to six hours of sleep a night compared to the seven to nine before

his diagnosis with depression or bipolar disorder and that on some nights, even with the help of

medications, he could not get to sleep for hours or even all.  Similarly, in *McAlindin*, 192 F3d at

1235, a genuine issue of fact existed where the plaintiff stated that he had experienced great

difficulty sleeping at night and his doctor had explained to the plaintiff's supervisor that this was

a side effect of his many medications.

     Multnomah County points out that not all courts agree with these broad interpretations of

the substantially limiting standard for the major life activity of sleep. This court has reviewed

those cases and is not persuaded that they support a deviation from the broad holding of *Head*.

*See Swanson v. Univ. of Cincinnati*, 268 F3d 307, 316 (6th Cir 2001); *Pack v. Kmart Corp.*, 166

F3d 1300, 1306 (10th Cir 1998), *cert denied*, 528 US 811 (1999); *Colwell v. Suffolk County Police*

*Dept.*, 158 F3d 635, 644 (2nd Cir 1998). The divergence in these opinions reveals that what constitutes a significant limitation in the major life activity is largely an issue of fact to be resolved by the fact-finder and not by this court. This is particularly true here where Lucke claims that she sleeps only four to five hours a night, that her sleep disturbances have been ongoing for several years, and that medications did not help.

The evidence in this case, while minimal, is sufficient for a jury to conclude that Lucke's difficulty with sleeping is substantial when considering its duration and severity in comparison with the sleep patterns of the average person. This court is not convinced that the evidence submitted by Multnomah County directly contradicts Lucke's testimony. It would be possible for a jury to conclude that Lucke suffers from a mental illness that substantially affects her sleeping, yet is still able to participate in some of her activities of normal living. On the other hand, a jury could conclude that her activities effectively refute Lucke's claim. Furthermore, Lucke explains that based on the phrasing on the job application, she thought the question asked her whether she was "unable to work," and not whether she considered herself to have a disability. Lucke Decl. (docket #101), ¶¶ 1-2. The jury must resolve this the weight and effect of this evidence, not this court.

Multnomah County also points to a recently produced note dated February 12, 2008, by Dr. Goldberg that Lucke's "sleep [is] good. She gets approximately 6 hours of sleep between 1:00 and 7:00 AM, and usually takes a one hour nap in the afternoon. She is having no nocturia now." Second Morf Decl., Ex. 52. This note indicates that whatever sleep problems Lucke once had no longer exist. Although an impairment need not be permanent in order to rise to the level of a disability under the ADA, it does not include temporary medical conditions. *See, e.g.,* 29

CFR pt. 1630, app., § 1630.2(j) ("temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities.").

Lucke has submitted additional evidence to contradict the assertion that her disability has dissipated (docket ##105-09). But even if this court were to interpret the evidence as defendants suggest, among the circuits "there is some uncertainty with respect to whether a temporary disability, as a matter of law, cannot constitute a disability under the ADA." *Diaz v. Fed. Express Corp.*, 373 F Supp2d 1034, 1046 (CD Cal 2005). Instead, each impairment must be analyzed on a case-by-case basis. *See* 29 CFR pt. 1630, app., § 1630.2(j). Just as it was "not completely clear" that the plaintiff's temporary mental impairment of an Adjustment Disorder with Mixed Anxiety and Depressed Mood arising from harassment suffered at work "could not constitute a disability as a matter of law" in *Diaz*, it is equally unclear that Lucke's similar mental impairment which she suffered for well over a year could not rise to the level of an ADA disability.

Lucke's evidence that she suffers from a disability under the ADA based on a substantial limitation in her ability to sleep is minimal at best. However, in light of *Head*, even this minimal evidence is sufficient to create a genuine issue of material fact.

### (2). <u>Thinking</u>

Multnomah County also argues that Lucke has failed to establish a genuine issue of fact on whether she suffers from a significant limitation in the area of thinking. Lucke alleges that her mental disorder causes:

> thinking and concentration problems every day, including the inability to read normally (I have to read and again read the same written paragraph repeatedly), substantial memory problems ever day. [] I have trouble with recall requiring me to keep lists . . . . I am constantly searching for words, I am forgetful and I have locked myself out of my house and [car] several times, I have had to attach my keys to my wrists, I wander into rooms and

wonder why I was there, I am constantly misplacing papers, bills, and other documents as well as my cell [phone], I forget to turn [off] the stove and leave it unattended.

Lucke Aff., ¶ 124.

She testified similarly at her deposition.  Lucke Depo., p. 204.

On the other hand, Lucke's testimony is seemingly contradicted by her own psychiatrist who assessed her mental status as being "verbally expressive and [she] had no trouble following the train of the conversation.  Her thought processes appear to be unimpaired.  It is estimated that she is functioning in the average to high average range intellectually."  Morf Decl., Ex. 26., p. 3.  This opinion is corroborated by that of another psychiatrist who evaluated Lucke and found her "general appearance, speech, affective responses, cognitive functions and thought processes entirely normal.  I found absolutely no immediate abnormality on clinical examination."  Morf Decl., Ex. 27, p. 1.

Lucke submits that these comments are not truly contradictory because the various psychiatrists did not specifically ask how her mental problems affected her day-to-day activities.  Additionally, even if her symptoms were less significant at the time of her examinations, she argues that they may have been greater at other times.

In *Fraser v. Goodale*, 342 F3d 1032, 1044 (9th Cir 2003), *cert denied*, 541 US 937 (2004), the Ninth Circuit found that the plaintiff failed to create an issue of fact as to whether she was substantially limited in the major life activity of thinking where the evidence showed that she had suffered insulin reactions sufficiently severe to limit her thinking only three times in a five month period.  In contrast, in *Head*, the Ninth Circuit found that the plaintiff had created an issue of fact where he asserted in a declaration that his mental disorder

> greatly affected my short-term memory and ability to concentrate both
> before and after I was hospitalized. I could not stay focused on something
> for more than brief periods. I did not have much of a short-term memory at
> all.  I had to be repeatedly reminded of appointments, or tasks I had to do. .
> . . If I looked at written material for too long things just got jumbled in my
> mind and I would have to stop. I could not sit and focus on an entire
> television show. In the fall of 2001 I quit school because of my inability to
> focus or concentrate adequately.

413 F3d at 1061 (ellipsis in original).

Lucke asserts limitations that are remarkably similar to those asserted in *Head*.  In addition, forgetting that she left a fanny pack with a loaded weapon on the counter in the women's locker room could be taken as concrete evidence that she does have a significant memory problem.  Thus, she has raised a genuine issue of material fact on this issue.

### (3).   Conclusion

Lucke has provide sufficient evidence from which a jury could conclude that she suffers from a mental impairment that substantially limits the major life activities of sleeping and thinking.

### b.   Causation:  ADA Claim

The ADA prohibits discrimination against an individual "because of" that individual's disability.  42 USC § 12112(a).  In order to establish causation, the plaintiff must show that the defendant had knowledge of her disability when making the adverse employment decision.  *See Taylor v. Principal Fin'l Group, Inc.*, 93 F3d 155, 162-64 (5th Cir), *cert denied*, 519 US 1029 (1996).  However, the plaintiff's disability need not be the sole reason for the defendant's actions.  Rather, liability attaches when the plaintiff's disability is a "motivating factor" in the defendant's adverse employment decision.  *Head*, 413 F3d at 1065 ("[W]e hold that the ADA outlaws adverse

employment decisions motivated, even in part, by animus based on a plaintiff's disability or

request for an accommodation - a motivating factor standard.").

Lucke alleges that Multnomah County began discriminating against her after she disclosed

her disability.  SAC, ¶ 75.  Lucke was not diagnosed with a mental impairment until July 12,

2006.  Morf Decl., Ex. 27.  Thus, Multnomah County could not have known of Lucke's emotional

condition until it received Dr. Turco's June 14, 2006 report.  It certainly was aware that she

claimed to be disabled after July 24, 2006, when it received notice of Lucke's July 12, 2006 BOLI

complaint alleging that Lucke's disability was a "mental or emotional condition or disorder."

Morf Aff., ¶ 12, Ex. 20, & Ex. 19, p. 4.  Ott responded to this allegation by letter dated July 24,

2006, asking Lucke to clarify whether she was requesting an accommodation.  Lucke responded

by letter dated July 28, 2006, requesting several accommodations and setting forth the facts that

supported her claim that she suffered from a disability.  *Id*, Ex. 11.  Sheriff Giusto claims that he

first learned of Lucke's alleged disability on August 2, 2006, when she sent him a letter

explaining her belief that she had been discriminated against and asking for accommodations.

Giusto Decl., ¶ 12, Ex. 21.  Based on these facts, the same adverse employment actions discussed

in Lucke's ADA retaliation claim apply to her ADA disparate treatment claim.

Viewing the evidence in the light most favorable to Lucke, a genuine issue of material fact

exists on the issue of causation with respect to both the 15-day suspension and termination.

Sheriff Giusto's statement that he would not "accommodate" Lucke raises the specter of

discriminatory animus in his decision to suspend her for 15 days for the reasons discussed above.

With respect to Lucke's termination, Multnomah County argues that this action was based

upon Lucke's extensive and unprecedented disciplinary history of six confirmed IAU

investigations over a three-year period.  When asked what steps led to his decision to terminate

Lucke, Sheriff Giusto explained:

> Well, I'll tell you that what I remember is that a person with a relatively
> short work history with Internal Affairs complaints both initiated by
> supervisors and others, and an employee who had a number of chances to
> raise that work performance to a satisfactory level, and in some cases was –
> in the case of the failed training program being offered again, as I said
> earlier, offered her a unique opportunity to try again, and a concern that the
> employee was not going to meet minimum performance standards for an
> employee of her tenure, and that the issue of others' safety in the institution
> were at question.  And based on the totality of the circumstances relative to
> my experience, I believe either five or six Internal Affairs investigations,
> that I made the decision to terminate Ms. Lucke.  That's what I can
> remember.

Giusto Depo., pp. 48-49.

     As further evidence that Lucke's termination was not motivated by her disability,

Multnomah County points to the fact that the IAU team and Chief Deputy Bishop recommended

termination on Lucke's fifth IAU investigation months before Lucke disclosed her disability.

However, the record does not support that argument.  Interim Chief Deputy Hasler issued her

initial recommendation for the fifth IAU investigation on March 31, 2006, of a combined 10-day

suspension, or five days for each sustained offense.  Morf Decl., Ex. 11, pp. 5-6.  However, not

until July 24, 2006, did she change her recommendation to termination.  That is the same day Ott

first became aware that Lucke considered herself to have a disability.  *Id*, Ex. 11, pp. 3-4.

Furthermore, although Lucke was not terminated after her sixth IAU investigation (an

unprecedented disciplinary history according to Multnomah County), Sheriff Giusto told Lucke

that he did not want any "half-employees" working for the MCSO.

     Lucke alleges and additional adverse employment action based on her transfer to Human

Resources.  Other than the generalized argument that the record is "rife with actions taken

against" Lucke "either because she disclosed her disability or because she was perceived as disabled," Lucke fails to point to a single specific fact that would support that this transfer was motivated in part because of her disability. The only comment linking this transfer to any form of discrimination is Captain Yankee's remark that she needed to "take care of her family." That comment, if anything, supports Lucke's medical leave claims, not her disability claim.

### c.    Causation:  Sex Discrimination Claim

"In order to prevail on a Title VII disparate treatment sex discrimination claim, an employee need only establish that, but for his or her sex, he or she would have been treated differently." *Jespersen v. Harrah's Operating Co., Inc*., 392 F3d 1076, 1079 (9th Cir 2003), citing *UAW v. Johnson Controls, Inc.*, 499 US 187, 200 (1991). One way that Lucke can do this is by showing that "similarly situated men were treated more favorably . . . ." *Villiarimo*, 281 F3d at 1062 (citations omitted).

Neither party has presented arguments on this issue. In their briefing and at oral argument, defendants asserted that Lucke's SAC alleged only a claim of retaliation based upon sex, not disparate treatment. Lucke did not address this issue in her briefing and presented no substantive argument at oral argument to rebut defendants' characterization of her SAC.

Nevertheless, this court finds that Lucke has failed to present sufficient evidence on this claim to permit it to go to trial. Lucke made two broad and general claims that can be read to support this element of her disparate treatment claim. First, she claims that male and female deputies were treated differently with respect to the break times, duties and shift assignment. Second, she claims that in several of her IAU investigations, she was singled out for punishment despite the fact that male deputies were equally involved in wrongdoing. However, Lucke has

failed to present any evidence to support these claim.  For example, Lucke claims that during the second failure to engage incident, the deputy in control of the door violated MCSO policy by opening the door prior to sufficient back up arriving.  However, Lucke has provided no evidence of this policy.  Also, Lucke ultimately was terminated for a violation of the gun policy and has not shown that any similarly situated male employee was treated differently. Indeed,  she has not shown that any employee, male or female, is similarly situated with respect to her extensive disciplinary history.

With respect to her claim that male deputies were treated more favorably in break, recreation and shift assignments, concrete evidence is lacking.  Other than the declaration of Kimmell, which closely mirrors Lucke's allegations, no evidence shows that Lucke suffered in her job duties and break time because of her sex.  Multnomah County has presented evidence that shift assignments are made pursuant to a lottery which Lucke has not refuted.

Lucke's claim for disparate treatment on the basis of sex fails at this level of the analysis. Therefore, Multnomah County's motion is granted with respect to Lucke's disparate treatment theories for her Fifth and Seventh Claims.

///

## 2.    **Multnomah County's Justifications**

As discussed above, Multnomah County has asserted legitimate justifications for each of the adverse employment actions at issue in this case.

## 3.    **Pretext**

As discussed above, Lucke has provided sufficient evidence of pretext to survive summary judgment on her ADA retaliation claim.  For the same reasons, Multnomah's County's motion is denied with respect to the ADA disparate treatment claim.

### D.    Failure To Accommodate Disability

The ADA establishes that an employer also discriminates by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified . . . employee, unless the covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  42 USC § 12112(5)(A).  An employer who fails to engage in the interactive process in good faith faces liability under the ADA if a reasonable accommodation would have been possible.  *Barnett v. U.S. Air, Inc.*, 228 F3d 1105, 1116 (9th Cir 2000), *judgment vacated on other grounds*, 535 US 391 (2002).  In order to establish a reasonable accommodation claim, the employee bears the burden of establishing the existence of a specific reasonable accommodation that the employer failed to provide.  *Memmer v. Marin County Courts*, 169 F3d 630, 633 (9th Cir 1999).  Lucke has failed to meet this burden.

Lucke's argument that Multnomah County failed to engage in the interactive process in good faith is not supported by the record.  The record shows that Multnomah County, through Ott, contacted Lucke regarding her need for reasonable accommodations within a day of learning that she claimed to be disabled.  In response, Lucke requested four accommodations and in her later letter to Sheriff Giusto requested additional "retraining as you and the Agency deems appropriate."  *Id*, Exs. 12 & 13.  Multnomah County accepted Lucke's request and, without agreeing that she had a disability, offered her position back to her along with six months of

psychological counseling, additional retraining and another fitness for duty examination after six months. *Id*, Ex. 22, pp. 1-2. It also agreed to hold disciplinary action in response to her fifth IAU investigation in abeyance.

In other words, except for transferring her to a different facility, Multnomah County offered her precisely what she requested as accommodations. Lucke accepted the accommodations and continued working until her termination after her sixth IAU investigation. Lucke does not even attempt to identify what other accommodations she needed that would have enabled her to perform her job's essential functions. Therefore, her reasonable accommodation claim fails.

  **E.**  **Hostile Work Environment Claim:  Disability**

Lucke's final claim under the ADA asserts that Multnomah County subjected her to harassment in the form of a hostile work environment because of her disability. Multnomah County contends that because the Ninth Circuit has not yet recognized such a claim under the ADA, this court should reject Lucke's claim outright. *See Brown*, 336 F3d at 1190. While this court finds Lucke's argument persuasive that this court should recognize such a claim, it is unnecessary to decide this issue. Even if this court were to recognize such a claim, Lucke's claim fails based on the lack of a *prima facie* case.

///

///

  **1.**  **Legal Standard**

Both parties agree that the Title VII framework should be applied to an ADA hostile work environment claim. Pursuant to that framework, Lucke:

must raise a triable issue of fact as to whether (1) she was "subjected to verbal or physical conduct" because of her [disability], (2) "the conduct was unwelcome," and (3) "the conduct was sufficiently severe or pervasive to alter the conditions of [Lucke's] employment and create an abusive work environment."

*Manatt v. Bank of Am.*, 339 F3d 792, 798 (9th Cir 2003) (setting forth elements for hostile work environment claims under Title VII and § 1983), quoting *Kang v. U. Lim. Am., Inc.*, 296 F3d 810, 817 (9th Cir 2002).

## 2.    **Analysis**

As discussed above, Lucke has raised a triable issue that she has a disability for purposes of the ADA.  However, Lucke has adduced no facts demonstrating that she was subjected to unwanted verbal or physical conduct due to her disability that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.

An abusive work environment exists when the workplace is "permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. . . ." *Harris v. Forklift Sys.*, 510 US 17, 21 (1993) (internal quotations, citations omitted).  Whether Lucke's treatment rose to this level "can be determined only by looking at all the circumstances" which may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id* at 23.

 Even viewing the facts in the light most favorable to Lucke, and, therefore, assuming that Lucke was subjected to "campaign of harassment" at the hands of Sergeant Parker, Sergeant Bogdonavich, and others after the Dawson escape, nothing in the record supports the inference

that their treatment of her was due to her being disabled or their perception of her as disabled. According to Lucke, Sergeant Parker denied her training during 2004 and 2005 and also "made it very clear that she considered me to be incompetent and did not want me to do hospital duty again.  She called me an idiot and made derogatory remarks about my mental state."  Lucke Aff., ¶ 37.  Accepting Lucke's testimony as true, it is clear that Sergeant Parker and others did not like Lucke and treated her poorly.  She was denied training, harassed over her work performance, treated with contempt and singled out for discipline.

Nevertheless, nothing indicates that Sergeant Parker, or any other person, did so on the basis of Lucke's disability as opposed to some other basis.  The mere fact that in June 2006 Lucke was diagnosed with a mental disorder does not imbue all previous instances of mistreatment of Lucke with a motive of invidious discrimination.  Rather, the absence of any allegations of harassment prior to the Dawson escape support the inference that Sergeant Parker and others harassed Lucke because they perceived her to be incompetent and not because they perceived her to have a mental disability.

The first and only reference in the record which really supports an inference of maltreatment on the basis of Lucke's disability are the comment by Sheriff Giusto that he would not accommodate her and did not want any "half employees" working for the MCSO.  While these isolated comments may be sufficient to raise an inference that the discrete actions taken by the MCSO on those dates were motivated in part by her disability, they fall short of establishing an abusive working environment.

### 3.    Conclusion

Because she cannot establish a *prima facie* case, Multnomah County's motion is granted with respect to Lucke's putative hostile work environment claim based on her disability.

## IV.    **Medical Leave:  FMLA (Third Claim) & OFLA (Fourth Claim)**

### A.    **Legal Standard**

The FMLA allows two general types of claims.  First, it is unlawful for a covered employer "to interfere with, restrain or deny the exercise of . . . any right" provided under the FMLA.  29 USC § 2615(a)(1) ("interference claim").  Second, it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA.  29 USC § 2615(a)(2) ("retaliation claim").  A FMLA claim must be brought "not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought."  29 USC § 2617(c)(1).  The FMLA extends this deadline to three years for willful violations.  29 USC § 2617(c)(2).

A retaliation claim under 29 USC § 2615 (a)(2) requires proof that the employer took some discriminatory action against an employee who opposed a practice made unlawful by the FMLA.  *Bachelder v. Am. West Airlines, Inc.*, 259 F3d 1112, 1124 (9th Cir 2001).  This provision "[does] not cover visiting negative consequences on an employee simply because he has used FMLA leave."  *Id*.  When this occurs, the employee's only remedy is an interference claim under 29 USC § 2615(a)(1).  Moreover, if an employee's request for leave was wrongfully denied, or an employer has in some way acted to discourage an employee from taking leave, then the employee has an interference claim and not a retaliation claim.  *Id*; 29 CFR § 825.220.

An interference claim under 29 USC § 2615 (a)(1) may be premised on activity by an employer "that tends to chill an employee's freedom to exercise his rights."  *Bachelder*, 259 F3d

at 1123 (internal quotations and brackets omitted, citation omitted).  This claim protects

employees against actions which discourage employees from exercising their right to take FMLA

leave.  *See*, *e.g.*, *Traxler v. Multnomah County*, 2008 WL 282272, *16 (D Or Jan. 29, 2008)

(plaintiff submitted sufficient evidence to create a factual issue that the County interfered with

FMLA rights by complaining about the amount of FMLA leave used, expressing concern about

the amount of time she had missed work, and complaining that the plaintiff dropped the ball while

out on FMLA leave).

The OFLA is "construed to the extent possible in a manner that is consistent with any

similar provisions of [the FMLA]. " ORS 659A.186 (2),   However, claims under the OFLA are

limited to those incidents occurring after February 11, 2006.

> **B.**      **Analysis**

> **1.**      **Retaliation**

The allegations in the SAC do not state a claim for FMLA or OFLA retaliation.  Lucke

does not allege that the Multnomah County took any discriminatory action in response to her

opposing an unlawful employment practice under the FMLA or the OFLA.  Her allegations are

properly characterized as an interference claim.  Therefore, defendants' motion is granted as to

any FMLA or OFLA retaliation claim.

///

> **2.**      **Interference**

> > **a.**      **Failure to Plead**

Multnomah County also argues that Lucke has failed to adequately plead an interference

claim.  She alleges only that taking FMLA leave was "a substantial motivating factor in

defendant's decision to not assign the plaintiff to her regular duties" and was "a substantial

motivating factor in threatening the plaintiff with termination."  SAC, ¶¶ 94-95.  She does not

allege that Multnomah County "interfered" with her FMLA rights.

Multnomah County urges this court not to read an interference claim into these allegations

because Lucke has already filed three separate complaints, none of which included a claim for

interference; the deadline for joining all claims is long passed; the parties engaged in extensive

discovery; and defendants filed their motion for summary judgment based on the complaint.  For

support they cite *Pickern v. Pier I Imports (US)*, Inc., 457 F3d 963, 968-69 (9th Cir 2006), which

barred plaintiff from bringing new factual allegations not falling within his original complaint in

response to defendants' motion for summary judgment

Defendants' attempt to preclude Lucke from asserting her FMLA claim is unavailing.

This case in not like *Pickern* because the factual allegations asserted by Lucke have been

consistent throughout this litigation.  Furthermore, the allegation that taking FMLA leave was a

"substantial motivating factor" in not assigning Lucke to her regular duties and in terminating her,

closely tracks the actual language of an interference claim in which a plaintiff must prove that the

taking of FMLA leave was a "negative factor" in an adverse employment action.  *See Xin Liu v.

Amway Corp.*, 347 F3d 1125, 1136 (9th Cir 2003).

Even if this court construed Lucke's response as a motion to amend her pleadings,

Multnomah County has not argued that it would suffer undue prejudice by having to defend

against a new legal theory which is based on the exact same factual transactions that serve as the

basis for all of Lucke's other claims.

### b.    Merits

To prevail on an interference claim, Lucke must prove that she was subjected to negative consequences because she used FMLA leave or that her taking of FMLA leave was a "negative factor" in Multnomah County's decision to take an adverse employment action against her. *Xin Liu*, 347 F3d at 1136.  The evidence shows that Lucke used FMLA leave extensively.  See Lucke Aff., ¶¶ 13, 47, 50, 58, 62, 67, 72, 99, 100-103, 108, 147, 149, Ex. HHH.  In support of its motion, Multnomah County has submitted a compilation of Lucke's time records from July 1, 2000, through March 31, 2007.  Morf Decl., Ex. 37.  Over this six-and-one-half year period, Lucke took approximately 56 days of FMLA leave, including 10 days in 2004, 13 days in 2005, and 24 days in 2006.  She asserts that "every time I took FMLA leave, I ended up with an Internal Affairs complaint filed against me."  *Id*, ¶ 62.  However, the evidence on this point is equivocal. The time records show the following temporal relationship between Lucke's taking FMLA leave and the IAU investigations initiated against her:

First IAU Investigation:  Lucke took FMLA leave from December 27 to 28, 2003, and the Dawson escape occurred on December 31, 2003, which ultimately led to discipline.

Second IAU Investigation:  On June 24, 2005, the first failure to engage incident occurred. Lucke took three days of FMLA leave immediately following the incident and asserts that when she returned, an investigation was initiated into her conduct.  Moreover, she took three more days of FMLA leave from August 20 to 22, 2005.  On the day she returned, Captain Yankee referred the second complaint to the IAU.

Third IAU Investigation:  Lucke took three more days of FMLA leave from September 17 to 19, 2005.  The third investigation was initiated on October 31, 2005, the day after Lucke allegedly encouraged inmates to fight.

Fourth IAU Investigation:  Lucke took four days of FMLA leave from December 23 to 26, 2005.  On December 28, Deputy Bogdonovich told Lucke to change how she kept the log book, and an investigation was started after Lucke's failure to comply was discovered three days later. Lucke was not disciplined for this complaint until July 28, 2006, a week after returning from 21 days of FMLA leave.  She received a 15-day suspension for this incident, despite the fact that the initial recommendation was only five days.

Fifth IAU Investigation: The incident occurred on January 6, 2005, the day after the fourth IAU complaint was referred.  This incident was referred to the IAU on January 9, 2005. Discipline was held in abeyance.

Sixth IAU Investigation:  Lucke left her gun at work on January 23, 2007.  This incident was referred to the IAU on January 25 2007, resulting in Lucke's termination on June 27, 2007. The time records end on March 31, 2007; up to that point, Lucke had only taken five days of FMLA leave, all of it in March.

It is difficult to draw any strong correlation between the IAU investigations, Lucke's discipline, and her use of FMLA leave.  This court has found no reference to Lucke's use of FMLA leave, or any type of leave for that matter, in any of the reports submitted by the IAU inspector or SORT members for each investigation.  In addition, Lucke used FMLA leave on numerous occasions with no adverse consequences.

On the other hand, Lucke also alleges she was placed on administrative leave and transferred to the Human Resources Department where she was assigned only menial tasks based on her use of FMLA leave as evidenced by Captain Yankee allegedly telling her that her transfer was due to Lucke's need to "to take care of her family" and that she would be placed across the

street until "this is cleared up." Ex. 21, p. 8. Lucke believes this was a direct reference to taking FMLA leave to care for her father's terminal illness. While Captain Yankee's own testimony disputes this version of events (Yankee Depo., p. 85), if a jury believes Lucke's account which she has repeated on multiple occasions, it could find that her placement on administrative leave was an effort to chill her use of her protected FMLA rights or to visit negative consequences on her for using FMLA leave.

Finally, Lucke points to the fact that after she returned from taking two weeks of FMLA leave on July 10, 2006, she was pulled into a meeting with Ott and Chief Deputy Bishop who asserted that she could not perform the essential duties of her job and that she should resign or they would recommend her termination. However, those comments were made after receiving Dr. Corey's report, taking Lucke off work for a week, and having her reevaluated by Dr. Turco. Nothing other than timing in way relates this meeting to the taking of FMLA leave.

Although Lucke's evidence is very weak, the court nevertheless finds that Lucke has created a triable issue of fact on whether Multnomah County interfered with her FMLA rights.

However, the same is not true of the OFLA claim. Lucke's transfer to Human Resources and the alleged comment by Captain Yankee occurred on January 13, 2006. Lucke's OFLA claim is limited to allegations falling within 180 days before the filing of the initial Complaint on August 10, 2006, and therefore excludes actions before February 11, 2006. Thus, the key event evidencing discrimination based on the taking of medical leave occurred outside of the timeline imposed by the OTCA and cannot be considered as the basis of an interference claim under the OFLA. That leaves only the comments made at the July 10, 2006 meeting which are insufficient alone to support an OFLA claim.

Accordingly, Multnomah County's motion is denied as to the FMLA interference claim, but granted as to the OFLA claim and the FMLA retaliation claim.

**V.     § 1983 Claim (Eighth Claim)**

The Eighth Claim alleges that defendants violated § 1983 which prohibits "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by a person acting "under color of any statute, ordinance, regulation custom, or usage, of any State . . . ." 42 USC § 1983. This is the only claim asserted against the individual defendants in their individual capacities.

Defendants do not seek summary judgment on the basis of qualified immunity, but simply challenge this claim on its merits. First, they argue that Lucke cannot establish that she suffered a violation of a constitutionally protected right. Second, they assert that she cannot prove that the deprivation of her rights was effected pursuant to a formal policy, practice, or custom of Multnomah County and, therefore, cannot establish municipal liability under § 1983. *Board of County Comm'rs v. Brown*, 520 US 397, 402-03 (1997); *Trevino v. Gates*, 99 F3d 911, 918 (9th Cir 1996), *cert denied*, 520 US 1117 (1997).

///

**A.     Constitutional Violation**

Defendants argue that they did not violate any of Lucke's constitutionally protected rights. Lucke responds that in order to prevail, she need only prove that defendants' acts deprived her of some right, privilege or immunity secured by the Constitution. She submits that she has done so by making claims under several federal statutes and by submitting a record "rife" with facts from which a reasonable jury could find that her "rights" were violated in the pretext of discipline.

78 - OPINION AND ORDER

1.    **First Amendment**

Lucke's argument could be read as asserting that she engaged in protected speech in the form of asserting claims under two federal statutes, Title VII and the ADA.  In order to establish that Multnomah County violated her First Amendment right to freedom of speech, Lucke must demonstrate:  (1) she engaged in speech that was of public concern; (2) the employer took an adverse employment action against her; and (3) the speech was a substantial or motivating factor for the adverse action.  *Thomas v. City of Beaverton*, 379 F3d 802, 808 (9th Cir 2004) (citation omitted).  This court has already concluded that defendants took adverse employment actions against her and that the proximity in time of her protected activity (filing of her BOLI complaint) and the adverse employment actions provides sufficient evidence that her speech was as substantial or motivating factor.  Therefore, the only remaining issue is whether her speech was a matter of public concern.

A public employee's speech may involve a matter of public concern when spoken "as a citizen upon matters of public concern" rather than "as an employee upon matters only of personal interest . . . ." *Connick v. Meyers*, 461 US 138, 147 (1983).  Whether a public employee's expressive conduct is a public concern is a question of law determined "in light of 'the content, form, and context' of the expressive conduct 'as revealed by the whole record.'" *Alpha Energy Savers, Inc. v. Hansen*, 381 F3d 917, 924 (9th Cir 2004), citing *Connick*, 461 US at 147-48 & 148 n7, *cert denied*, 544 US 975 (2005).

Defendants argue that Lucke's complaints are not matters of public concern, but rather are individual grievances upon matters of a personal interest.  This court would agree but for the holding in *Alpha Energy Savers* that a public employee's expressive conduct is a matter of public

concern if "it contributes in some way to the resolution of a judicial or administrative proceeding in which discrimination or other significant government misconduct is at issue — even if the speech itself would not otherwise meet the *Connick* test were we to consider it in isolation." *Alpha Energy Savers*, 381 F3d at 927.  In reaching this holding, the Ninth Circuit rejected the view that a "'run-of-the mine single-plaintiff discrimination case' does not meet the public concern test."  *Id* at 926, quoting but expressing disagreement in part with *Yatvin v. Madison Metro. Sch. Dist.*, 840 F2d 412, 420 (7th Cir 1988).  Speech that addresses merely individual personnel disputes and grievances is not ordinarily a matter of public concern.  *See McKinley v. City of Eloy*, 705 F2d 1110, 1114 (9th Cir 1983) ("Speech by public employees may be characterized as not of 'public concern' when it is clear that such speech deals with individual personnel disputes and grievances and that the information would be of no relevance to the public's evaluation of the performance of governmental agencies.").  But the broad language in *Alpha Energy Savers* appears to elevate the act of filing an administrative complaint with the EEOC or BOLI to a matter of public concern protected by the First Amendment.  "Disputes over racial, religious, or other such discrimination by public officials are not simply individual personnel matters[,]" but "involve the type of governmental conduct . . . in which the public has a deep and abiding interest."  *Alpha Energy Savers*, 381 F3d at 926-27.

Moreover, Lucke's first BOLI complaint asserted more than her own personal individual grievance against defendants by making the more general allegation that the MCSO treated female deputies "very differently than male deputies" in terms of being allowed more time for recreation and working out while on duty.  Morf Decl., Ex. 19, p. 7.  *See Thomas*, 379 F3d at 808 ("[T]he type of personnel matters that we have deemed unprotected under the public concern test

are employment grievances in which the employee is complaining about her *own* job treatment, not personnel matters pertaining to others.") (emphasis in original).  Thus, Lucke has established a *prima facie* case of First Amendment retaliation.

Once an employee has established a *prima facie* case of First Amendment retaliation, an employer can still escape liability by showing that "legitimate administrative interests in promoting efficient service-delivery and avoiding workplace disruption outweigh" the employee's free speech interests.  *Alpha Energy Savers*, 381 F3d at 923, citing *Pickering v. Bd. of Educ.*, 391 US 563, 568 (1968).  Alternatively, the employee can prove by a preponderance of the evidence that she "would have taken the same action in the absence of the [employee]'s expressive conduct."  *Id*, citing *Bd. of County Comm'rs, Wabaunsee County, Kan. v. Umbehr*, 518 US 668, 675-76 (1996).  Because defendants have not attempted to make either showing, this court does not address those issues in this motion.

### 2.    Equal Protection

It is also possible that Lucke asserts a claim for a violation of equal protection.  However, an equal protection claim based on a "class of one" theory is not permissible in the context of public employment.  *Enquist v. Or. Dep't of Agric.*, 128 S Ct 2146 (June 9, 2008).  Other than her broad statement that the record is "rife" with evidence that her rights were violated, Lucke has failed to present any argument or facts showing that she was discriminated against on the basis of her status as a member of a suspect class.  The only allegations on this point are that female deputies were treated less favorably than male deputies and that male deputies allegedly disrupted her radio transmissions on a few occasions.  This falls short of her obligation to "identify with reasonable particularity the evidence that precludes summary judgment."  *Keenan v. Allan*, 91

F3d 1275, 1279 (9th Cir 1996) (internal quotations, citation omitted).  Thus, Lucke has failed to

show a genuine issue of fact on this issue.

### 3.    Other Violations

Lucke fails to offer any other cognizable theory supporting a § 1983 claim for violation of

rights protected by the Constitution and laws of the United States.

### B.    Municipal Liability

Defendants also argue that even assuming that Lucke is able to advance a plausible theory

under § 1983, her claim must still fail on the grounds that she is unable to "identify a municipal

'policy' or 'custom' that caused [her] injury."  *Board of County Comm'rs*, 520 US at 403, citing

*Monell v. New York City Dept. of Social Servs.*, 436 US 658, 694 (1978).  Multnomah County

may not be held liable "solely because it employs a tortfeasor."  *Id.*  Lucke may meet this burden

by advancing one of three theories:  (1) a Multnomah County employee committed the alleged

violation pursuant to a formal policy, practice, or custom constituting the county's standard

operating procedure; (2) an official with final policy-making authority committed the

constitutional tort, making the challenged action itself an act of official government policy; or

(3) an official with final policy-making authority ratified a subordinates unconstitutional action

and the basis for it.  *Trevino*, 99 F3d at 918; *Gillette v. Delmore*, 979 F2d 1342, 1346-47 (9th Cir

1992), *cert denied*, 510 US 932 (1993).

Lucke premises municipal liability on the fact that many of the allegedly adverse actions

were committed, or at least ratified, by Sheriff Giusto who, according to Lucke, is an official with

final policy-making authority.  In *Pembaur v. Cincinnati*, 475 US 469, 481 (1986), the Supreme

Court held that official policy includes not only rules of general application, but may also include

"a course of action tailored to a particular situation and not intended to control decisions in later situations." However, in order for Sheriff Giusto's discrete actions towards Lucke to constitute the official employment policy or custom of Multnomah County, he must "be responsible for establishing final government policy respecting such activity . . . ." *Id* at 483. Whether Sheriff Giusto had final policy-making authority in the area of employment policy is determined by "[r]eviewing the relevant legal materials, including state and local positive law, as well as 'custom or usage' having the force of law . . . ." *Jett v. Dallas Indep. Sch. Dist.*, 491 US 701, 737 (1989) (internal quotes, citation omitted). Thus "[a] municipal employee may act as a *de facto* policymaker under § 1983 without explicit authority under state law, but [a court is] ordinarily 'not justified in assuming that municipal policymaking authority lies somewhere else than where the applicable law purports to put it.'" *Lytle v. Carl*, 382 F3d 978, 982-83 (9th Cir 2004), quoting *City of St. Louis v. Praprotnik*, 485 US 112, 126 (1988).

Defendants maintain that Sheriff Giusto possesses no policy-making authority with respect to employment policy in Multnomah County. Rather, the County Chair, by virtue of the County Charter, possesses final policy-making authority in this area:

> The chair of the board of county commissioners:
> (1)    Shall be the chief executive officers and personnel officer of the county; . . .
> (3)    Shall have sole authority to appoint, order, direct and discharge administrative officers and employees of the county, except for the personal staff, employees or agents of elective county offices. . . .

Morf Decl., Ex. 41, p. 2 (Multnomah County Home Rule Charter, § 6.10).

As further proof of this authority, defendants argue that the personnel rules in effect at the time of Lucke's termination are those adopted by the County Chair. *Id*, Ex. 42. As such, they maintain that *Pembaur* is directly on point:

> Thus, for example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff is the official policymaker, would give rise to municipal liability. Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions would represent county policy and could give rise to municipal liability.

*Id* at 483 n12.

In their view, this case is analogous to *Gillette* 979 F2d at 1350, which held that a fire chief's action in firing the plaintiff could not form the basis for municipal liability because the City Charter and ordinances established that the City Manager and City Counsel were the only officials with policy-making authority in this area.

However, unlike in *Gillette*, it is far from clear in this case that only the Board established employment policy for MCSO employees. As demonstrated repeatedly in this case, final disciplinary decisions for the MCSO were made by Sheriff Guisto. In reaching his decisions, he accepted recommendations from the IAU and the Chief Deputy but was not bound by their recommendations and doled out more or less discipline at his discretion. There is no evidence

that his decisions were subject to review by the County Chair or that the County Chair had any involvement in the disciplinary process whatsoever.

Moreover, while the personnel guidelines that governed Lucke may have been promulgated by the County Chair, the record shows that the Sheriff also issues employment policies in the form of "Corrective Action Guidelines" which establish the base sanction and range of sanctions possible for violations of specific sections of the MCSO Agency Manual.  *See* Snyder Decl., Ex. X.  The Agency Manual itself is referenced repeatedly throughout the record and apparently governs the rules of conduct and disciplinary process.  While no party has submitted a copy of the Agency Manual or elucidated the court on its method of promulgation or adoption, a previous case in this district pointed to the MCSO Agency Manual as evidence of Sheriff Giusto's employment policy-making authority when rejecting Multnomah County's municipal liability argument.  *See Montoyo v. Giusto*, 2004 WL 3030104, *12 (D Or Nov. 24, 2004).

Therefore, some evidence points to the conclusion that Sheriff Giusto is a final policy maker with respect to employment policy at the MCSO.  "If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." *Pembaur*, 475 US at 481. "[W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Id*.

At this point, the court is unable to reach a final conclusion on this issue.  Therefore, defendants' motion is denied with respect to Lucke's First Amendment retaliation claim.

However, the parties may present further evidence as to whether Sheriff Giusto was the final policy maker. Particularly relevant would be any provisions of state law or county ordinances on point and any evidence concerning the method by which the Sheriff adopts the Agency Manual and other personnel rules. Also, any evidence of the role taken by the County Chair in setting employment policy that specifically cabins the Sheriff's discretion would be highly relevant. This court will revisit this issue prior to submitting this claim to the jury at trial.

## VI.    Injured Worker Discrimination and Retaliation Claim (Tenth Claim)

ORS 659A.040 makes it "an unlawful employment practice for an employer to discriminate against a worker with respect to hire or tenure or any term or condition of employment because the worker has applied for benefits or invoked or utilized [Oregon's workers compensation laws]." To establish a *prima facie* case under this provision, Lucke must show:

> (1) that [she] invoked the workers' compensation system; (2) that [she] was discriminated against in the tenure, terms or conditions of employment; and (3) that [Multnomah County] discriminated against [her] in the tenure or terms of employment because he or she invoked the workers' compensation system.

*Williams v. Freightliner, LLC*, 196 Or App 83, 90, 100 P3d 1117, 1121 (2004) (internal quotations, citation omitted).

The same *McDonnell Douglas* analysis applies to workers compensation discrimination as to any other state law retaliation claim. *See Baumhover v. N. Bend Med. Ctr.*, 2008 WL 2874831 (D Or July 22, 2008).

Multnomah County concedes that Lucke satisfies the first two elements as she filed a workers compensation claim on May 23, 2006, was subjected to a 15-day suspension on July 25, 2006, and was terminated on June 27, 2007. Instead, it argues that Lucke cannot demonstrate

86 - OPINION AND ORDER

causation and cannot prove that their justifications were pretext for their decision to discriminate against her due to her participation in the workers compensation system.  Lucke again asserts that an inference of both may be drawn from the proximity of her claim and the disciplinary action taken against her.

This court finds that Lucke's claim fails at the level of pretext.  Here, timing is not enough.  Unlike the ADA claim, there is no other evidence that the filing of the workers compensation claim caused Multnomah County to take any adverse employment actions against Lucke.

**VII.    Failure to Reinstate (Eleventh Claim)**

Lucke's final claim asserts that Multnomah County violated ORS 659A.043 by failing to reinstate her to the position of Corrections Officer after her demand of August 31, 2007.  The reinstatement provisions of the Oregon workers compensation law provide that "[a] worker who has sustained a compensable injury and is disabled from performing the duties of the worker's former regular employment shall, upon demand, be reemployed by the worker's employer at employment which is available and suitable."  ORS 659A.046.  Multnomah County argues that Lucke's claim fails because her absence from work was not due to a work related injury, but instead was due to her discharge for misconduct.  Lucke argues that her she is entitled to reinstatement because the July 19, 2006 denial of  her workers compensation claim was overturned on July 25, 2007.  Lackey Decl., Ex. D.

"Reinstatement rights do not arise if the employer establishes that the worker was discharged from his pre-injury position for reasons unrelated to the injury or to his workers' compensation claim."  *Lane County v. State*, 104 Or App 372, 377, 801 P2d 870, 873 (1990), *rev*

*denied*, 311 Or 266, 810 P2d 855 (1991).  In reaching its decision, *Lane County* relied in part upon BOLI interpretive regulations.  One of these provides:

> An injured worker meeting the requirements for reinstatement under ORS 659A.043 loses the right to reinstatement to the worker's former position when any of the following occurs:
> * * *
> (g)  The worker is discharged for bonafide reasons not connected with the injury and for which others are or would be discharged.

OAR 839-006-0131(1)(g); *see Lane County*, 104 Or App at 376-77, 801 P2d at 872-73 (citing earlier version of the regulation).

Because Lucke has not stated a claim for discrimination on the basis of her workers compensation application, this court is inclined to conclude that she also has failed to state a claim for failure to reinstate.  However, neither party has addressed how a discriminatory discharge for other reasons unrelated to the filing of a workers compensation claim would affect this analysis.  Therefore, the court does not address this issue at this time.

## ORDER

Defendants' Motion to Strike (docket #80) and Motion to Reconsider Interim Order (docket #93) are DENIED.

Defendants' Motion for Summary Judgment (docket #63) in DENIED in part and GRANTED and the Interim Order is AMENDED in part as follows:

First (ADA) & Second (ORS 659A.100-.145) Claims:  Granted as to failure to accommodate and hostile work environment claims; denied as to retaliation and discrimination claims based on the major life activities of sleeping and thinking;

Third Claim (FMLA):  Granted as to retaliation claim and denied as to interference claim;

Fourth (OFLA), Fifth (Title VII), Sixth (ADEA), & Seventh (ORS 659A.030) Claims:

Granted;

Eighth Claim (§ 1983):  Denied with respect to First Amendment violations by all

defendants, and otherwise granted;

Ninth (ORS 659A.230) & Tenth (ORS 659A.040) Claims:  Granted;

Eleventh Claim (ORS 659A.046):  Denied.

DATED this 22nd day of September, 2008.

/s/_____
Janice M. Stewart
United States Magistrate Judge